**UNITED STATES of America, Plaintiff,**

v.

**Norris SHATES, Defendant.**

**No. CR–93–0282 TEH.**

United States District Court, N.D. California.

Dec. 5, 1995.

objectively reasonable. For reasons expressed at some length in the course of this Opinion, we so find.

Susan Badger, Asst. U.S. Atty., San Francisco, CA, for U.S.

Richard Ingram, Sebastopol, California, for Shates.

## ORDER

THELTON E. HENDERSON, Chief Judge.

The Court is in receipt of Magistrate Judge Langford's Findings and Recommendations, dated October 27, 1995, regarding the Defendant's motion to suppress in the above-captioned criminal action. After holding an evidentiary hearing on June 19–23, 1995, Magistrate Judge Langford found that Agents were within the limits of the Fourth Amendment during a warrantless, night-time search of Shates' property on May 28, 1992. Magistrate Judge Langford further found that the curtilage on this property extended only to the trailer and the immediate surroundings. Accordingly, Magistrate Langford recommended that Shates' motion to suppress this evidence be denied.

Pursuant to 28 U.S.C. § 636(b)(1), the Court has allowed the parties ten days to file written objections to Magistrate Langford's recommendations. Neither party has filed any objections. The Court, having reviewed the recommendations *de novo* and for good cause appearing, hereby accepts and adopts Magistrate Langford's Findings and Recommendations in full. Accordingly, defendant Shates' motion to suppress is hereby denied.

**IT IS SO ORDERED.**

## FINDINGS AND RECOMMENDATIONS

LANGFORD, Chief United States Magistrate Judge.

### INTRODUCTION

Defendant Norris Shates ("Shates") has moved to suppress all evidence gathered during a warrantless, night-time search of his property by law enforcement officers on May 28, 1992. The information gathered was relied upon to establish probable cause in an affidavit supporting a search warrant for his property. The search warrant was issued on June 16, 1992, and resulted in Shates' arrest on drug charges.

Shates now seeks suppression of all evidence seized as a result of the execution of the search warrant, including the 1,433 marijuana plants, on grounds that the agents obtained the information supporting probable cause for the warrant by conducting an illegal search. Specifically, Shates claims that when the agents conducted the reconnaissance and made the observations establishing probable cause, they were within the curtilage of his home, and thus were in an area in which he had a reasonable expectation of privacy. Shates therefore contends that the agents' warrantless entry into the area constituted an illegal search in violation of the Fourth Amendment.

The government opposes Shates's motion. The agents obtained probable cause to believe that marijuana was being cultivated on the property when they smelled the strong odor of marijuana, heard the sound of a generator, and verified the direction from which the marijuana odor was coming. They made these observations in two locations: in a brushy, unmaintained, and unused area well away from the living quarters on the property, and on the road passing the property. Neither of these areas was within the

curtilage of Shates's home on the property. Accordingly, no warrant was required for entry into these areas.

Further, when the agents corroborated their observations by approaching the building housing the marijuana cultivation operation, they still did not enter the curtilage of Shates's home. The building was devoted to the purpose of conducting a commercial marijuana cultivation operation and was a substantial distance away from the trailer in which Shates was residing. Thus, the agents' observations while alongside the building were properly included in the search warrant.

## PROCEDURAL BACKGROUND

This case was referred by the District Court (Hon. Thelton E. Henderson) for findings and recommendations regarding the extent of the curtilage of the Roderick Ranch ("Ranch"). An evidentiary hearing was conducted on June 19, 20, 22 and 23, 1995. Appearing for the Government was Assistant U.S. Attorney Susan Badger. Appearing for defendant was Richard Ingram, Esq. and Ann C. Moorman, Esq. The parties submitted proposed findings and recommendations to the court.

## OVERVIEW

■ A determination of curtilage relies heavily on the nature and use of the property in question. Accordingly, this Court analyzes each structure on the property and the property itself in some detail.

The extent of the curtilage is also intimately related to the activities of the law enforcement personnel during two time periods: (1) prior to the May 28, 1992 evening reconnaissance of the Ranch, and (2) on the May 28, 1992 evening reconnaissance of the Ranch. These findings of fact are discussed in some detail for both time periods to establish the state of mind of the law enforcement personnel and, therefore, the extent of the curtilage. The extent of curtilage is largely a subjective evaluation which is explained and discussed below in further detail.

## BACKGROUND

The Ranch is a 160 acre property located on Clow Ridge Road in rural Mendocino County (RT 459:8–10, 460:1). Norris Shates resided on that property for approximately 18–30 months (January of 1991–June 1992). (RT 459:1, corrected in Defendant's Proposed Findings at 3:7). Mr. Shates leased the property from Larry Roderick. (RT 459:11–15).

Sometime prior to April 29, 1992, Special Agent ("S.A.") Russell (of the Mendocino County-Wide Narcotics Task Force ("MNTF")) learned from a confidential reliable informant ("C.R.I.") that there was a methamphetamine lab in operation on the Ranch. RT 2:195–197, 204–206. Sometime on or about April 27, 1992, S.A. Russell requested that Mendocino County Deputy Sheriff Dennis Miller take aerial photographs of the Ranch. (Miller Decl. ¶ 8. RT 1:34, 2:206). On April 29, 1992, Deputy Sheriff Miller took those photographs listed as Government Exhibits 16(a)–(e). (Miller Decl. ¶ 8. RT 1:34–37).

Prior to May 28, 1992, S.A. Russell and the informant went to the western edge of the Ranch, and from Clow Ridge Road, the informant identified a structure with a green tar paper roof as the methamphetamine lab (this structure later proved to be the "grow structure" where marijuana was grown). (Russell Decl. ¶¶ 9–10.)

On May 28, 1992, at approximately 10:00 p.m., S.A. Russell led a group of S.A.'s from the Department of Justice, Bureau of Narcotics Enforcement ("DOJ"; "BNE") on a surveillance of the Ranch in an attempt to locate a hidden methamphetamine lab. (Russell Decl. ¶ 17.) While seven officers went up Clow Ridge Road, only S.A.'s Russell, Calvert, Nishiyama and Sypnicki breached the outer fence and entered the Ranch by crossing a dilapidated fence next to a gate at the south-east corner of the property. (Govt's Exhs. 1, 7(a)–(b).) The activities of the other agents are not relevant, since they waited at the road and did not participate in the reconnaissance.

Based on the information discovered that evening and on the information from the C.R.I., Deputy Sheriff Miller obtained a

search warrant on June 16, 1992. The warrant was executed at approximately 7:00 a.m. on June 26, 1992. Agents seized 1,433 marijuana plants in various stages of growth. Norris Shates was subsequently arrested and charged under 21 U.S.C. § 841(a)(1), cultivation of marijuana, and possession of marijuana with intent to distribute, under the same statute.

## CHRONOLOGY

| | | |
|---|---|---|
| April 29, 1992 | — | Deputy Miller takes first aerial photos. (Govt's Exhs. 16(a)–(e).) |
| May 28 | — | Russell and other S.A.'s visit the Ranch. |
| June 16 & 18 | — | Deputy Miller takes a second set of aerial photos. (Govt's.Exhs. 6(a)–(f).) |
| June 26 | — | Warrant executed. |

## ISSUES

There are five issues to be resolved, each intimately tied to determining the extent of the curtilage of Shates' home, whether Shates' Fourth Amendment rights were violated and whether the motion to suppress is proper:

(1) Was the informant's tip reliable;

(2) What was the layout of the Roderick Ranch on the evening of May 28, 1992;

(3) What were the activities of the law enforcement officers prior to and during the reconnaissance of May 29, 1992;

(4) Based on both the layout of the property and the activities of the law enforcement officers, what was the extent of the curtilage;

(5) Did the law enforcement officers obtain evidence for the search warrant in violation of Shates' Fourth Amendment rights.

## 1. INFORMANT'S RELIABILITY

While the reliability of the informant is not directly raised as an issue, it is relevant to the existence of probable cause for the issuance of the search warrant. If the informant's tip was unreliable, that would weaken the probable cause for the search warrant. Had the tip been sufficiently detailed, it is possible that the officers could have obtained a warrant without corroborating the tip. However, the officers had to corroborate the tip, since the tip did not allege that illegal drug manufacturing activities were occurring at that time, but only that they had occurred in the past.

The reliability of the informant may be determined by evidence adduced both before the evening of May 28, 1992 and after that evening.

Prior to the May 28, 1992 reconnaissance, the C.R.I. had been to the Ranch on four separate occasions over a three and a half year period—on three of those occasions he observed activity which could only indicate that methamphetamine was being made on the property. The most recent occasion had been in the Spring of 1991. (Statement of Probable Cause ("P.C.") 1; 2:1–18.) The C.R.I. related this information to S.A. Russell approximately one year after the last observation. This was not stale information, since the C.R.I.'s evidence indicated that the drug operation functioned on and off rather than on a continuous basis. There was every indication that this activity had been continuing for some time and may still have been occurring.

Moreover, the C.R.I. had already "provided reliable information that lead to the service of a search warrant and the arrest of at least one suspect for possession of methamphetamine for sale." (P.C. 1:17–20.)

After the May 28, 1992 reconnaissance, the findings of law enforcement agents corroborated relevant facts provided by the C.R.I. The C.R.I. had described the interior wall of the grow structure, which was corroborated by S.A. Russell when he shone his flashlight through the window. (Russell Decl. ¶ 24. P.C. 1:26–28; 3:3–5.) From the information adduced by the agents, the C.R.I. had clearly been on the premises and had provided reliable information that illegal activities were taking place on the premises. While the agents did not detect methamphetamine production at any time on the evening of May 28, 1992, this is not relevant to the inquiry. If a property is being used for one type of illegal activity, it is not an attenuated exercise in logic to assume that other related illegal activities may be occurring on the premises. Moreover, both Russell (Russell Decl. ¶ 30) and Calvert (Calvert Decl. ¶ 11) smelled the odor of chemicals used in the

production of methamphetamine on the day the warrant was executed.

Based on information from both before and after the May 28, 1992 reconnaissance, the information provided by the C.R.I. was reliable enough to warrant S.A. Russell's heightened interest in the Ranch and his subsequent visit to that property on May 28, 1992. Moreover, the C.R.I.'s tip along with the evidence gathered on the May 28, 1992 reconnaissance was sufficient probable cause.

## 2. LAYOUT OF RODERICK RANCH

The greatest dispute at the hearing revolved around the layout and use of the premises. Since curtilage is a fact-driven inquiry, each geographical location will be discussed separately to determine the nature and use of each area. The actual legal rule for curtilage is discussed below under Extent of Curtilage.

### General location

The Ranch is in a very remote and secluded rural area of Mendocino county, about eight miles north of highway 128, and about a forty five minute drive from that highway. There are two approaches to the Ranch along Clow Ridge Road—one approach is from Peachland Road, off of highway 128; the other approach is from Nash Mill Road, also off of highway 128 (RT 21).

The Ranch is located about eight miles north of highway 128 approaching from Nash Mill Road. The eight mile road is a dirt and gravel road with four locked gates prior to the Ranch. (RT 109–111; 460–461). Each of the gates had "no hunting" and "no trespassing" signs. (RT 110–111). Only property owners and their guests (or tenants) had the combinations to the locks (RT 27). Shates was not able to use Peachland Road, which was blocked by two locked gates, since access was only available by permission of the Clow or Leboux families (RT 113, 126). Shates used Nash Mill Road. (RT 465).

### Fences

There were no interior fences enclosing the single-story wood building, the split-level Class K structure, and the travel trailer. RT 2:210–211; Exh. 24A. The only interior fence was a wooden fence at the top of the driveway. RT 1:64; Exhs. 4A–B; 6A–B.

That fence, constructed of four horizontal boards with spaces in between, did not obstruct the view to the other side. Exhs. 4A–B, N. Nor did it obstruct the view into the property by someone on Clow Ridge Road. RT 1:58–59; Exh. 2, M. This fence did not connect with the travel trailer (Exh. 24A); nor did it connect with the fence running alongside Clow Ridge Road. RT 2:165; 4:447; Exh. 30.

The fencing on the property is both dilapidated and non-continuous. The fencing does not obscure vision nor does it prevent human entry. Despite statements by the defense, it does not seem that a continuous fence around the "compound" area would be prohibited by the terrain. As evidenced by all photographs, these were fences designed to keep cattle in or out—not to keep prying eyes or people out. (Govt's.Exhs. 2, 3, 4(a)–(b), 5(a)–(b), 6(a)–(i), 8(a)–(d), 16(a)–(e).) Judging by the condition of the fences, successfully corralling cattle on the Ranch would be a dubious proposition at best. The most substantial fence was located where the driveway met with the interior portion of the property. (Govt's. Exhs. 4(a)–(b) and others.) This fence was non-continuous with 2 open gate areas, and extended maybe 80–90 feet across the front of the "compound" area. Moreover, "No Trespassing" signs were not posted in the vicinity of the "compound" area. (Russell ¶ 16).

### The tree line

The northern side of the property is bordered by a forest, creating a demarcation on the northern side of the property. This "barrier" is not impenetrable though, nor does it share any similarities with a fence designed to enclose a home. (RT 1:165; 2:233–235). This assessment was based on agent Russell's lifetime familiarity with rural Mendocino County (RT 2:223–225, 233–236). While the trees do form a demarcation of the north side of the "compound," they are more akin to a mow line than to a fence. In a curtilage analysis, a fence may weigh more heavily in favor of a finding of curtilage, whereas a mow line weighs far less heavily.

### The gardens

On the property itself, the agents observed a small garden alongside the horizontal board fence in the area between the top of the driveway and trailer. Miller ¶ 13; RT 1:180–181; Exhs. 24A, N, T. Agent Nishiyama explored the northern sector of the property bordered by the travel trailer to the west, the trees to the north, the log to the east, and the grow building to the south, in order to see if there was another garden where the "mother" marijuana plants were located. RT 3:372–373. He found no gardens in this area. RT 3:373.

A second garden was allegedly located north east of the generator shed. Government's Exhibits 15(c)–(d) show what Shates alleges to be a garden. Defendant's own witness, private investigator Chris Reynolds, identified Government's Exhibits 15(c)–(d) as the garden in question to the north east of the generator shed. (Reynolds Transcript.) The only thing the agents found in this sector was a short, old wire fence that was broken down and in places, had been crushed and piled up. RT 1:63, 138; 2:239. It appeared to be an old fenced-in area that may have used at one time for a dog kennel or a garden. RT 2:239; Exhs. 15A–B. At this time, what was left of the fence enclosed only overgrown, natural vegetation such as small trees and weeds. Russell ¶ 29; Exhs. 15C–D.

A third garden was allegedly located along the southern fence, alongside Clow Ridge Road. While there does seem to be an area surrounded by chicken wire at that location, there is no evidence to indicate that this is not another weed infested plot.

A fourth garden mysteriously appeared in Defendant's Exhibit U, located about 15 feet to the east of the garden by the storage shed. This picture was taken on July 9, 1992. This garden was clearly not in evidence in any other picture submitted by either the Defense or Prosecution, yet would have been in plain view had it existed prior to or at the

time the warrant was executed. Shates also did not mention this garden at the hearing.

A fifth garden was alleged by Shates to be located just to the south of the south east corner of the grow structure. (Def.Exh. T.) Some gladiolas appear to be growing there in Defendant's Exhibit W, a July 9, 1992 photograph, but this is not in evidence elsewhere.

### Mowing pattern

The aerial photographs of April 29, 1992 depict a different mowing pattern than the aerial photographs of June 16 and 18, 1992. (Compare Govt's.Exhs. 6(a)–(f); 16(a)–(e).) No evidence was presented to determine the mowing pattern on the evening of May 28, 1992.

Testimony at the hearing showed that, in the rural areas of Mendocino county, people mow for many reasons other than a well manicured lawn. The residents mow to prevent ticks from jumping on their legs, to prevent fires, and to curb what is described as "a serious problem with rattlesnakes." (RT 1:44–45, 4:478)

### The log

The location of "the log" is a central factor in this case, since this is the first point at which the S.A.'s detected the odor of marijuana.

The log was located approximately 150 feet downhill from the single-story building with the green roof—at that time the suspected methamphetamine lab. RT 2:222, 226; Exhs. 11A, 24B.

The log was lying in deep grass, in an area of large trees, shrubs, and bushes, near the edge of the large stand of trees that bordered the northern area of the property. RT 2:228; 230; Exhs. 10A–B. The area had not been mowed; the log was below where the mowing in that area of the property ended. RT 2:220, 229.[1] Also see, RT 1:171; 178. There was nothing in this area to indicate that it was in use, or being maintained for use, by humans or domestic animals. RT

---

1. At the evidentiary hearing, Agent Russell pointed out the log as the item designated "log" on Exhibit 24 B. RT 2:217. He also pointed it out as the large piece of wood between two trees in the lower right-hand area of aerial photograph

Exhibit 6 H 1 (RT 2:219), as the log in the right-hand area of Exhibit 5A (RT 2:228), and as the log in right-hand area of Exhibit 8B. RT 2:228–229.

2:229. The log is approximately two and a half to three feet in diameter and approximately fifteen to twenty feet long. Close up pictures of the log are found in Government's Exhibits 5(a); 10(a)–(b); 11(a)–(b). The log is also visible in many of the aerial photographs.

For purposes of determining the location of the log (and where the Agents stood when they first detected the odor of marijuana), Government's Exhibit 24 accurately depicts the log's spatial relationship to the rest of the "compound." Moreover, Government's Exhibit 24 is accurate enough to determine the relative location of every relevant structure in question on the property.

Agent Russell explained that the log is located *at the treeline,* down the hill from the suspected methamphetamine lab/indoor grow structure. (Gov.Opp. ¶ 19). It should be noted that Private Investigator Reynolds, retained by the Defendant, observed on his July 9, 1992 visit to the premises that the log was 30 feet distant from the area which had been mowed (as of that date). (Reynolds Decl. ¶ 4.)

### The Dough-boy pool and portable pool

Shates testified that he had a portable pool that he moved around within the mowed compound during May and June of 1992. (RT 507, 519)

He also testified that he had a Dough-boy pool, which was a "24 four foot across, four foot deep" pool, with a capacity of 2500 gallons, which was one-half to three-quarters full, on the day of the execution of the search warrant. (Shates Reply Decl. ¶ 7., RT 508, 509, 523, Def.Exhs. R, P.)

Finally, Mr. Shates claims that when he returned to the property on June 27, the day after the search warrant was executed, the pool was completely disassembled and drained, and there had been some digging around where the water ran out. (Shates Reply Decl. ¶ 7, RT 511.) All that was left were the cut-up liner and the rigid circular siding which was the structure of the pool. This circle is visible in Defendant's Exhibit P.

### The hammock

Defendant's photo exhibits and videotape show a hammock. There wasn't a hammock present in that location on the morning when the warrant was executed. (Govt's.Exh. 17.) Shates claims that he had unhooked the hammock the night before because it had rained (RT 520). The hammock is not visible in Government's Exhibits 6(h)(1) & 6(a)–(c).

### Picnic table

Shates also describes the presence of a picnic table. (Shates Decl. ¶ 13.) A rudimentary table, consisting of a wood slab affixed to an old stump did appear in government's videotape.

### The grow structure

The grow structure is 105'–108' in a roughly southeast direction from the trailer. (Govt's.Exh. 24.) Approximately six feet to the north of the grow structure is a generator shed, where the generator which supplied power to the property is located. A generator is the only source of power in this remote location. For a layout of these two buildings see Government's Exhibit 18. There is a T.V. antenna on the roof, a doghouse on the porch, some chairs on the porch, and purified water bottles on the porch. (Govt's Exhs. 14, 17.)

The grow structure housed a marijuana cultivation operation, in which 1,433 marijuana plants were in different stages of growth. RT 1:89; Videotape Exh. 17; Diagram Exh. 18. The building was made up of a hallway running along the south and east sides of the building; two large grow rooms containing large, flowering marijuana plants; and two smaller growing rooms. Exh. 18; Miller ¶¶ 26–29; RT 1:90–93. The grow rooms contained oscillating fans and ballasts. Miller ¶¶ 26–29; RT 1:91–92. Power was supplied by a diesel generator housed in the shed just to the north of the grow building. Miller, ¶ 31; Videotape Exh. 17.

The hallways of the grow building were used to store bags of fertilizer and grow medium, tools, insecticides, water, and grow lights and shields. Miller ¶ 24; RT 1:92–93; Exhs. 17, 19A–C. The tools appeared to be those that were being used to maintain the marijuana operation and the building. RT

1:93, 151. The individual detained on the site that day, who said he was there to work on the Class K structure, had all the tools for that work with him. RT 1:86, 151. Gardening and other site maintenance tools were maintained in the storage shed at the top of the driveway. RT 1:181–182; 4:505.

In one of the hallways in the grow building, there was what appeared to be a functioning toilet. RT 1:93; Exh. 19C. There was also a shower in a stall, but the stall had been converted into storage space containing shelves and grow materials. Miller ¶ 24; RT 1:99. Apart from the toilet facility, there was no indication that the building was being used for any activity other than the cultivation of marijuana, and nothing to indicate that it was being used for living purposes. Miller ¶ 22; RT 1:94; 2:180. Although there was no evidence of an ongoing methamphetamine manufacturing operation on the premises, both Agents Russell and Calvert could detect the odor associated with the manufacture of methamphetamine while inside the building on the day that the search warrant was executed. Russell ¶ 30; Calvert ¶ 11.

### Relationship between grow structure and generator shed: marijuana odor

Whether the agents could detect the odor of marijuana is not directly at issue here, however it is relevant insofar as it helps this Court determine at what points the S.A.'s had probable cause to continue their investigation. It is also useful in determining whether there was sufficient evidence to issue a warrant prior to the S.A.'s advancing on the grow structure.

Each agent said that they could and did smell marijuana when they were standing at the log. The Defendant maintained that the hot air emitted from the diesel generator collided with the marijuana odor laden air coming out of a single vent in the attic of the grow structure and thereby destroyed any odor of the marijuana.

The placement of the exhaust vent tube on the generator shed would mean that the hot air from the diesel generator would have to shoot out the tube, across the 6 foot space separating the two buildings, and up about another 5 feet. (Govt's.Exh. 22(b).) Then the heat from the diesel would have to burn all of the odor out.

In the videotape supplied by the Defendant, the supposed positioning of the generator exhaust would have left significant diesel and burn streaks along the eaves of the generator shed. None were in evidence; there was no effort whatsoever to mask the odor of marijuana. (Defendant's Videotape, Exh. S.)

### The class "K" living structure

The class "K" living structure (so-called because it was originally not intended for human habitation but had been upgraded) is located to the right hand side of the drive after the driveway passes the entry gate. (Govt's.Exh. 16(b).) Very minimal tire markings are on the north and west sides of the K structure. Also see in Exh. 16(b) that the K structure appears to be on jacks or otherwise elevated/supported by posts. Jacks were in place on the morning that the warrant was executed (June 26, 1992, 7:00 a.m.) and it was also observed that the foundation was rotting and the K structure was under renovation. (Miller Decl. ¶ 22; Govt's.Exh. 17.) Shates contends that the K structure was only under renovation for "those few days" when the warrant was executed. (Shates Resp.Decl. ¶ 8.) Miller noted a sink and counter, a folded up ping pong table, an old couch, and marijuana clipping residue on the floor of the K structure. (Miller Decl. ¶ 22.)

Mr. Shates stated that the refrigerator was out of the K structure on those few days of renovation. (Shates Resp.Decl. ¶ 8, RT 500–502.) What appears to be a refrigerator is in evidence on the back porch of the K structure in an aerial photograph taken on April 29, 1992. (Govt's Exh. 16(d).) This refrigerator is evident in many other pictures taken prior to the day the warrant was executed.

An individual identified as Harry Hatfield was sleeping in a van parked in front of the K structure on the morning the warrant was executed—he was supposedly shoring up the foundations and remodeling the house. (Miller Decl. ¶ 22.) A log book with watering schedules was found in the van. (Govt's.Exh. 17.)

Several windows were missing in the K structure. In general, and from all outward appearances, it did not appear to be liveable.

Deputy Sheriff Miller offers the best evidence of the use of the K structure.

> An additional factor in the amount of marijuana odor being emitted into the surrounding air is that on May 25, 1992, 180 fully mature marijuana plants had been harvested out of grow room B–2, and were being dried and manicured in the Class K living structure under renovation. From my experience and training, I know that this drying process causes a tremendous amount of marijuana odor to be emitted into the surrounding air.
>
> I base the above opinion on my observations and investigation of the marijuana site as it was in operation on June 26, 1992; my review of notated wall calendars for May and June, 1992 and notated wall boards found in the grow building on June 26, 1992; and the diary of Marsha Freitas ([Shates' female companion]) found during the June 26, 1992 search.

(Miller Decl. ¶¶ 34–35.)

Deputy Miller further testified that it is dangerous to be around marijuana while it is drying, since organic chemical agents released during the drying process are dangerous to the human respiratory system. This further supports the theory that no one lived in the K structure at the time.

### The trailer

Agent Russell examined the aerial photographs taken by Deputy Miller before undertaking further investigation of the property. He noted the layout of the property, the location of the travel trailer and other structures, and the fact that the "well-beaten" driveway path led to the travel trailer. (RT 2:209). A number of factors led him to believe that the trailer was the living quarters on the property: the fact that a trailer was on the property; that the driveway led to the trailer and not to the other buildings; that he had information that the Class K structure was an old sheep shearing barn and had no information that it was being lived in; that at least from 1987 through the spring of 1991, the single-story structure had been

used to manufacture methamphetamine; that he had no information that the single-story building had been or was being used as a living quarters. RT 2:327.

The trailer contained a bed, an eating area with table and seats, a clothes closet with men's and women's clothing inside, a kitchen area containing a working stove, refrigerator, and sink, a bathroom with functioning toilet and shower. (Miller ¶ 21; RT 1:80–81; Videotape Exh. 17). The refrigerator was cold and had perishable food inside; the sink contained dirty dishes, pots, and pans; on the stove there was a coffee pot and tea kettle that looked like they had been used recently; the sink had running water. *Id.*

The bathroom also appeared to be functional. After she was detained, Ms. Freitas asked repeatedly if she could use the toilet. When given permission to do so, she went into the bathroom in the trailer. Russell ¶ 28; RT 1:82–83; 2:258; 3:414. The agents did not direct her to use the bathroom in the trailer, and she did not say that there was another bathroom on the premises that she wanted to use. *Id.* When the agents later dismantled and removed the trailer, they found a three-inch septic hose that led from the bathroom of the trailer, and along the ground outside to a point where it disappeared underground. The pipe appeared to contain fresh sewage; and had an odor consistent with a septic system. RT 1:81, 144–145, 182; 2:260–261; Exh. 31.

There was a television antenna posted at the garden located to the north of the tool shed. Mr. Shates testified that he used this antenna to run his television in the trailer. (RT 486) Defendant's videotape shows the wire running from the antenna to the trailer. (Exh. S)

### The toilets

There was considerable dispute over the toilet facilities on the premises. Shates' alleges that the toilet in the trailer was not useable; that it operated on a "grey water" system. (Shates' Decl. ¶ 8.) A grey water system is not used to transport human waste. However, when Marsha Freitas stated that she had to use the restroom (the morning the warrant was executed) she was uncuffed and

went straight to the restroom in the trailer. (Russell Decl. ¶ 28) Shates alleges that she was forced to use this restroom, and that this was the only time the restroom in the trailer had been used. (Shates Reply Decl. ¶ 3) (Def.Exh. A.) Shates did not produce any evidence to this effect—not even a statement from Ms. Freitas.

When Russell removed the trailer from the property at a later date, he noticed that there was a 3–5 inch in diameter septic hose attached to the bottom of the trailer which ran out in to the trees and in to the ground. (Russell Decl. ¶ 28.) Shates stated that "there was no septic tank as such to allow for the use of the toilet in the trailer" but neglected to mention the septic hose. (Shates Decl. ¶ 8.)

Shates claimed that it was a grey water system, which only carried out dish and shower water. However, agents did find human waste when they disconnected the hose. (RT 1:81, 144–145, 182; 2:260–261, Exh. 31.) There was toilet paper near the toilet in the trailer.

The toilet in the grow shed was also fully operational. Shates insisted that guests used this toilet when they came to visit; that no one smelled the marijuana when they used the toilet because the inner wall prevented the smell of marijuana from escaping. The assertion that marijuana odor did not escape the inner room is disproved by the agents' testimony that they smelled it immediately outside the structure.

## CONCLUSION ON THE LAYOUT

Based on the evidence submitted regarding the layout of the Ranch, this Court makes the following findings of fact.

1) **Location**—The Ranch is located in a very rural and secluded location which has few passerby.

2) **Fences**—The fences are incomplete and not of the variety intended to obscure vision or prevent human entry.

3) **Tree line**—The tree line is not so dense as to create an impenetrable barrier akin to a fence.

4) **Gardens**—The only garden which clearly existed was the one just to the north of the tool shed at the entryway to the main "compound" area.

5) **Mowing pattern**—The extent of the mowing pattern on May 29, 1992 is impossible to ascertain. The Government's "16 series" exhibits taken on April 28, 1992 depict a markedly different mowing pattern than the Government's "6 series" exhibits taken on June 16 and 18, 1992.

6) **The Log**—The log is indisputably located 150 feet to the east of the north eastern corner of the grow structure, and approximately 150 feet to the southeast of the trailer. The log is in the tree line at least 30 feet outside of any mow line, in the tall grass.

7) **Dough-boy pool**—There is no direct evidence of a 24 foot, 4 foot deep Dough-boy pool. At one point and time, there was a ten foot wading pool on the premises. There is no evidence to indicate that it was on the premises on the May 29, 1992 reconnaissance.

8) **Hammock**—The hammock is an after-the-fact addition by the defendant.

9) **Picnic table**—The "picnic" table existed, but there is no evidence to indicate that it was used on a regular or semi-regular basis.

10) **Marijuana odor**—There is nothing to indicate that any efforts were made to mask the odor of marijuana. Based on the evidence, it is certain that the odor of marijuana could be detected from some distance, weather conditions permitting.

11) **Grow Structure**—The grow structure was primarily used for the growth of marijuana. In part, the walkway between the interior and exterior walls served as both a restroom facility and a storage space.

12) **K Structure**—The K structure was used to dry, manicure and package the marijuana. During the relevant times, April 28, 1992 to June 26, 1992, the K structure was not used for any domestic purposes whatsoever. Moreover, by all outward appearances, it did not appear to be a habitable building.

13) **Trailer**—The trailer was Shates' residence; he conducted all the intimacies of domestic life in and about the vicinity of the trailer.

14) **Toilets**—Toilets in the grow structure and trailer were both operational.

## 3. LAW ENFORCEMENT ACTIVITIES

Diagrams listed as Government's Exhibits 24(b)–(e) indicate the general courses of travel for each agent. At the hearing, there was conflicting testimony as to the exact course taken by some of the agents, but at no time did these differences exceed by a few yards. Moreover, it was a very dark night, making spatial determinations very difficult and impairing normal sensory abilities. Any discrepancies are minor enough and sporadic enough to be overlooked. Even if each error were construed as against the officer in question, it would not alter the determination of curtilage or whether the evidence obtained for the warrant was obtained in a manner proscribed by the Fourth Amendment.

On the night of May 28, 1992, Agent Russell, accompanied by Agents Michael Calvert, Joseph Sypnicki, and Robert Nishiyama of the California Bureau of Narcotics Enforcement, conducted an on-foot reconnaissance of the Roderick property in order to determine whether methamphetamine manufacturing was in fact taking place on the property. RT 2:211, 216. The agents drove to Clow Ridge Road and at about 10:00 p.m., stopped at a point about a quarter-mile east from the Roderick property. RT 2:213. They then walked up the road until they reached the dilapidated gate along the eastern stock fence. RT 2:216; Exhs. 7A–B, 24B.[2] At this point, the agents left the road, passed without any difficulty through the broken down part of the gate, and moved into the open field that comprised the eastern portion of the Roderick property. RT 2:216.

The agents' point of access was well east of the partial eastern cross-fence. Exh. 24B. Agent Russell had chosen this approach because, based on what he knew of the property, the east side appeared remote and not in use as the living area. He testified that from what he knew, the area was "all overgrown, it's semi-rough terrain, the fences were dilapidated, I didn't see any livestock, I didn't see any sign of human use, no vehicle traffic, no

vehicle trails, no foot trails, nothing." RT 2:213. When at the broken-down gate, Agent Russell saw no "no trespassing" or "private property" signs. RT 2:216. *Also see,* RT 1:73, 113 (nearby gate across Clow Ridge Road just above, and to the west, of this access point, separated the Roderick ranch and the Clow property to the east; the only sign on the road gate was a "no hunting" sign).

The area was extremely dark; there was no moonlight and no ambient light from any houses or streetlights. RT 3:402. In fact, all of the agents noted that it was very dark that night, and throughout their reconnaissance they had difficulty navigating and in seeing and keeping track of each other. RT 2:219; 3:336; 3:363; 4:412. Their vision was aided by the use of a night vision scope and flashlights. RT 2:214.

The agents entered the property over a dilapidated section of fence on the south eastern edge of the fence line. (Govt's.Exhs. 7(a)–(b) RT 2:216.) They traveled from this point to the log. Each of the four agents who went on May 28, 1992 reconnaissance were very familiar, through their experience and training, with the odor of marijuana. Russell, ¶¶ 2–5; RT 2:222; Sypnicki, ¶¶ 1–3; RT 2:334–335; Nishiyama ¶¶ 3–5; RT 3:359–360; Calvert ¶ 3; RT 3:399. Each agent was also familiar, through his experience and training, with the odor associated with the manufacture of methamphetamine. Russell ¶ 8; RT 2:194; RT 2:335–336 (Sypnicki); RT 3:358–359 (Nishiyama); Calvert ¶ 2; RT 3:399.

Once this group reached the log, S.A. Russell stated that he detected the odor of marijuana. (Russell Decl ¶ 18.) At the log, S.A. Supervisor Calvert (Calvert Decl. ¶ 18), S.A. Nishiyama (Nishiyama Decl. ¶ 7), and S.A. Sypnicki (Sypnicki Decl. ¶ 4) also noted the smell of marijuana. On the morning that the warrant was executed, Mendocino County Deputy Sheriff Dennis Miller, who is an expert in marijuana detection (Miller Decl. ¶¶ 2, 4, 5) stated that he detected the odor of marijuana when he was approximately *300*

---

**2.** During his testimony at the evidentiary hearing, Agent Russell pointed out this gate as the

one depicted at the bottom left-hand corner of Exhibit 24 B. RT 2:215.

*feet* to the east of the grow building (this places Mr. Miller approximately 150 feet distant from the log, in a straight line with the grow structure). (Miller Decl. ¶ 17.) Mr. Miller also detected the odor of marijuana at the log. (Miller Decl. ¶ 36(d).)

As Agent Nishiyama crossed the open field, he stopped every so often to see if he could smell the odor of chemicals. What he smelled instead was an occasional odor of fresh, growing marijuana; at that point, he could not tell where the odor was coming from. Nishiyama ¶ 7; RT 363–364. When he smelled the marijuana, he was still in the area to the east of the cross-fence and before reaching the log. RT 3:363–364, Exh. 24D.[3]

From the log, the S.A.'s each went their own way.

### Sypnicki

Agents Russell, Sypnicki, Nishiyama, and Calvert testified at the evidentiary hearing on June 19 through 23, 1995. Each examined a clean copy of the stipulated diagram Exhibit 24, and marked his route of travel during the May 28, 1992 reconnaissance. See, Exhs. 24B (Russell); 24C (Sypnicki); 24D (Nishiyama); and 24E (Calvert).

Sypnicki's path is recorded in Government's Exhibit 24(c). S.A. Sypnicki remained at the log. (Sypnicki Decl. ¶ 4. RT 3:342–343) He could see the glow of lights from the trailer. *Id.* He also smelled marijuana; a slight breeze from the structures carried the smell uphill to him (RT 2:340–341, Exh. 24(c))

### Calvert

Calvert's path is recorded in Government's Exhibit 24(e). S.A. Calvert walked a short way southwest to view the generator shed from a distance, then continued up the hill along the treeline, moved to the grow building where he briefly met up with S.A. Nishiyama, then to the "K" structure, and back to the log RT 3:365, 413. During his reconnaissance among the structures, S.A. Calvert

smelled the strong odor of marijuana. (Calvert Decl., ¶¶ 8, 9, 10.) He also saw lights on in the trailer and a person in the trailer RT 3:367–368.

According to Agent Calvert, the fact that he had not yet smelled methamphetamine did not necessarily indicate that a methamphetamine lab was not present on the property. RT 3:413–414. The ability to detect the odor of a lab would depend on a number of factors, including the wind conditions, the air temperature and which chemicals were present. RT 3:414. According to Agent Nishiyama, "oftentimes, methamphetamine laboratories are camouflaged in a way to minimize odors, so, consequently, sometimes you can smell them from a great distance, and sometimes you need to be even closer." RT 3:366.

### Nishiyama

Nishiyama's path is recorded in Government's Exhibit 24(d). As Agent Nishiyama crossed the open field, he stopped every so often to see if he could smell the odor of chemicals. What he smelled instead was an occasional odor of fresh, growing marijuana; at that point, he could not tell where the odor was coming from. Nishiyama ¶ 7; RT 363–364. When he smelled the marijuana, he was still in the area to the east of the cross-fence and before reaching the log. RT 3:363–364, Exh. 24D. S.A. Nishiyama crossed from the log, to the generator shed, to the grow building, where he put his nose against a ground vent on the north side of the grow structure to confirm that the marijuana odor was indeed emanating from that particular structure RT 3:368. This suspicion was confirmed when he smelled the strong odor of marijuana clearly emanating from the vent. (Nishiyama Decl. ¶¶ 8–9.) Nishiyama also used night vision goggles to take down the license plate of a truck on the property RT 3:369, 395. S.A. Nishiyama then returned to the log RT 3:411–412.

---

3. Each of the four agents who went on May 28, 1992 reconnaissance were very familiar, through their experience and training, with the odor of marijuana. Russell, ¶¶ 2–5; RT 2:222; Sypnicki, ¶¶ 1–3; RT 2:334–335; Nishiyama ¶¶ 3–5; RT 3:359–360; Calvert ¶ 3; RT 3:399. Each agent was also familiar, through his experience and training, with the odor associated with the manufacture of methamphetamine. Russell ¶ 8; RT 2:194; RT 2:335–336 (Sypnicki); RT 3:358–359 (Nishiyama); Calvert ¶ 2; RT 3:399.

*Russell*

From his position at the log, Agent Russell could also hear the sound of a generator coming from the same direction as the marijuana odor. RT 2:227–228. Agent Russell was very familiar with the sound of generators (RT 2:225), and from his law enforcement training and experience, knew that generators can be a source of power for indoor marijuana cultivation operations. Russell ¶¶ 2, 7; RT 2:224–225.

S.A. Russell's path is recorded in Government's Exhibit 24(b).

S.A. Russell continued a short distance up the hill in a west—northwesterly direction along the tree line to several stumps in the unmowed grass. S.A. Russell once again detected the odor of marijuana and further established that the odor came from the area of the buildings. (Russell Decl. ¶ 20; Govt's Exhs. 6(e)(f), 12(a)–(d).)

From the stumps, the travel trailer was visible and he could see a shirtless man moving about in the trailer. (Russell Decl. ¶ 21, RT 2:241). S.A. Russell then traveled in a direct line towards the north east corner of the grow structure and continued to a point mid-way along the east side of the grow structure. (Govt.Exh. 1; Russell Decl. ¶ 23, RT 2:244, 247–248). The windows on that side of the building were boarded up. (Govt's.Exh. 13.)

He could hear two sounds coming from inside: the deep, low hum of electrical converters, or ballasts, and the sound of oscillating fans. Russell ¶ 23; RT 2:244, 247–248. From his experience and training in indoor marijuana growing operations, he knew that this equipment was consistent with that used in those operations. Russell ¶ 22; RT 2:244. *Also see,* Miller ¶ 6; RT 1:91. At the same time, Agent Russell could still hear the separate hum of the generator coming from the shed just to the north of the building (Russell ¶ 23; RT 2:247), and could smell the odor of growing marijuana. RT 2:247–248. Based on all of his observations thus far, Agent

Russell believed that marijuana was being grown inside the single-story structure. RT 2:248.

S.A. Russell then went to the south side of the grow structure and shone his flashlight into the window, and saw an interior wall obstructing further view into the grow structure. (Russell Decl. ¶ 24, RT 2:250). At no time did Russell step on to the porch area.

Russell returned to the log and regrouped with the others RT 2:250–251.

The four agents briefly discussed the fact that the single-story wood frame building appeared to house a marijuana cultivation operation. RT 2:252; 3:371; 3:412. The agents then retraced their route across the eastern field to Clow Ridge Road. RT 2:252.

Once he got back to Clow Ridge Road, Agent Russell walked west up the road to an area where the road met the driveway. RT 2:252; Exh. 24B.[4] He did this in order to see whether the marijuana smell might be coming from an area beyond the hilltop where the single-story building was located on the Roderick property. RT 2:253. Agent Russell observed that the wind was still coming from the southwest, the same direction from which it had been blowing when he was standing down by the log and stumps. RT 2:253–254; Exh. 24B.[5] He did not detect the odor of marijuana from this position on the road (RT 2:253); this confirmed his belief that the marijuana odor was coming from the area where the buildings on the property were located. Russell, ¶ 26.

*Facts relating to the search warrant*

Regarding the previous night's reconnaissance, Agent Russell told Deputy Miller that he had been accompanied by other agents on the trip (Miller ¶ 10; Statement of Probable Cause, at PC–2); that he had smelled the odor of growing marijuana at the two locations near the treeline (Miller ¶ 10; PC–2; RT 2:255); that he believed, based on the direction of the wind, that the odor was coming from a building on the property (Miller ¶ 10; PC–2); that he had heard the sound

---

**4.** At the hearing, Agent Russell marked an "X" at the top left-hand corner of diagram Exhibit 24B in order to show where he stopped on Clow Ridge Road. RT 2:252–253.

**5.** Agent Russell marked the wind direction on the diagram Exhibit 24B with three directional arrows to the upper right of the Class K building. RT 2:253–254.

of a generator while located at the two positions (*Id.*); that he had heard the sounds of ballasts and fans coming from inside the building, while up at the building (Miller ¶ 10; PC–3); and that he believed that he was outside the curtilage of the property when he made these observations (*Id.*).

Deputy Miller included this information in an affidavit for a search warrant, and on June 16, 1992, obtained the warrant from Superior Court Judge King in Mendocino County. RT 1:168. The warrant authorized the agents to search the Roderick ranch for both marijuana and methamphetamine, along with the paraphernalia and items associated with the cultivation or manufacture of those drugs. *See,* Search Warrant and Affidavit, Exh. A attached to Def.'s Mot. to Suppress, filed May 9, 1994.[6]

Based on the information gained from the informant and this reconnaissance, Deputy Sheriff Miller acted as Affiant to obtain a search warrant. Specifically, the Statement of Probable Cause lists the following in support of the warrant:

1) The informant's surveillance of the property on four previous occasions, including the informant's direct observations of activities related to the manufacture of methamphetamine on three of those occasions;

2) from two separate locations in the tree line, S.A. Russell's detection of the odor of marijuana emanating from the vicinity of the suspected grow structure;

3) S.A. Russell's detection of the sound of fans and ballasts;

4) S.A. Russell's visual observation through a window of the grow structure of an inner wall, obstructing further view into the grow structure. (P.C. 2:19–3:5.)

*Execution of Search Warrant*

Deputy Miller, accompanied by Agents Russell, Sypnicki, Nishiyama, Calvert, and other law enforcement officers, executed the search warrant at 7:00 a.m. on June 26, 1992. RT 1:68–69.

Deputy Miller documented the scene with photographs and a videotape. Exhs. 17 (government videotape), 19A–21B2.

The officers approached the property along the same route taken on the night of the reconnaissance. Miller ¶ 17; RT 1:71; 2:258. When Deputy Miller was in the open field, approximately 300 feet east of the suspected lab/grow structure, he could smell the "definite odor" of marijuana. Miller ¶ 17. *Also see,* RT 1:177–78. The odor became stronger as they walked down the ravine in the northeast area of the property, and then up toward the structures on the hill. RT 1:77–78. As Deputy Miller approached and moved alongside the generator shed and the eastern side of the lab/grow structure, he heard the sound of the operating generator and could smell the "very strong" odor of marijuana. Miller ¶ 19.[7] Deputy Miller, along with other officers, went directly to the travel trailer, where they found Shates and a woman, Marsha Freitas, in bed. Miller ¶ 20; RT 1:79. The agents allowed them to put on clothes and then took them outside the trailer, where they were detained. RT 1:79.

## 4. EXTENT OF CURTILAGE

### 1) Traditional analysis

The Fourth Amendment protects any area for which an individual has a constitutionally protected expectation of privacy. *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). However, "the expectation [must] be one that society is prepared to recognize as 'reason-

---

**6.** At the same time, Deputy Miller also obtained a search warrant for the house, business, and vehicles owned and/or occupied by an individual named Bruce Caborn. The probable cause to search these places for evidence of marijuana and/or methamphetamine, and the production thereof, was based partially on the fact that the license plate on the vehicle seen by Agent Nishiyama at the Roderick property on May 28, 1992, was registered to "Bruce's Sharpening Shop," a business owned by Bruce Caborn. PC–4; Govt's Exh. A, filed separately. As is clear from reading the two search warrants, the license plate was not part of the probable cause to search the Roderick property.

**7.** Although he was familiar with the Roderick ranch property from other investigations (RT 1:34–35), this was the first time he had been on the property where the structures were located. RT 1:190.

able.'" *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The curtilage inquiry requires the court to determine whether an area "harbors those intimate activities associated with domestic life and the privacies of the home." *United States v. Traynor,* 990 F.2d 1153 (9th Cir.1992), citing *United States v. Calabrese,* 825 F.2d 1342, 1350 (9th Cir. 1987).

■ In *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court set forth four factors to assist in determining the curtilage in each case. These are:

1) the proximity of the area claimed to be curtilage to the home;

2) whether the area is included within an enclosure surrounding the home;

3) the nature of the uses to which the area is put;

4) the steps taken by the resident to protect the area from people passing by.

As advised in *Dunn:*

[c]ombining these factors [does not] produce[ ] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of the Fourth Amendment protection.

*Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139.

The *Dunn* four factor test is intended to separate the expectation of privacy which society deems to be reasonable from those which society deems to be unreasonable. Property used to conduct illegal activity is widely regarded as undeserving of any expectations of privacy. Moreover, a place where the manufacturing and packaging of drugs takes place is most certainly not "an area [which] harbors those intimate activities associated with the home." *Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. at 1139 n. 4. For these reasons, the third factor in the four factor *Dunn* test is of particular importance.

■ Often, law enforcement officers will obtain additional information as they approach the property or structure in question. Good examples are a strengthening odor of marijuana, an absence of human activity, or an absence of lighting. As the level of objective data indicating that a particular piece of property is being used for illegitimate purposes increases, the curtilage recedes before the advancing officers. This produces the notion that curtilage is never fixed, rather it has elastic properties, and may stretch or contract based on the amount of objective information possessed by the law enforcement officers. In fact, the third factor in the *Dunn* test is the only elastic factor, and accordingly should come under great scrutiny to ensure Fourth Amendment freedoms.

The activities and responsibilities of law enforcement places an officer in a position where he must determine whether or not it is reasonable for him to continue his advance on to private property. If there are any questions about the legitimacy of that advancement, then it becomes an issue for the courts to resolve.

In *United States v. Depew,* 8 F.3d 1424 (1993), the Ninth Circuit found that law enforcement agents did not possess enough objective data to warrant walking up to a remote residence which exhibited clear signs that privacy was desired. Law enforcement did not possess *any* information that could indicate that Depew was currently manufacturing drugs at that location, and therefore the agent's proximity to the house when he detected the odor of marijuana placed him within the curtilage and the evidence was rightly suppressed. However, had law enforcement possessed clear evidence that Depew was manufacturing drugs on the premises, an entirely different outcome is likely.

This possibility was a reality in *Dunn.* Law enforcement possessed a significant amount of information regarding the illicit uses of the barn in question. Not only did they have information indicating that Dunn had unloaded chemicals for the production of methamphetamine in the barn, law enforcement also followed the smell of methamphetamine up to the edge of the barn where they looked in past the netting for visual verifica-

tion. Absent the objective information, the officers may well have been within the curtilage.

### 2) Outbuildings do not constitute a "primary residence"

■ In this case, the inquiry centers on the location and extent of the curtilage on the Roderick Ranch property on May 28, 1992. The Defendant tries to make a novel argument. When making the four part *Dunn* analysis, the Defendant seeks to use an outbuilding or structure as the point of reference for the curtilage determination rather than what the law commonly recognizes as the home.

Instead of a standard primary structure which harbors the intimate activities associated with domestic life, Shates argues that each independent structure serves as a part of the home and should be regarded as under the same roof—he says that he sleeps, showers and cooks in the trailer; uses the restroom in the grow shed; sunbathes nude and meditates on different portions of the Ranch; and gardens at five different locations on the property.

■ Shates says that the Fourth Amendment protects structures other than dwellings. This is true. A person may be protected from a search of an outbuilding, depending on a number of factors. These factors may include the statutory authority under which the building is searched, whether the defendants' possessions are in the building and whether the building is locked and defendant possesses the key. *U.S. v. Santa Maria*, 15 F.3d 879, 882–883 (9th Cir.1994). In the *Santa Maria* case, agents of the Border Patrol searched a property, ostensibly for illegal immigrants, as authorized by 8 U.S.C. § 1357(a)(3). This statute authorizes Border Patrol agents to enter private land within twenty-five miles of the border "to prevent the illegal entry of aliens." The agents fortuitously found marijuana in a locked storage trailer full of defendant's possessions, to which defendant possessed the only key. The trial court denied a motion to suppress evidence obtained from the search of the storage trailer. Defendant was convicted on drug charges.

On appeal, the court found that the locked storage trailer was not legitimately subject to search under the circumstances. The court found that the agents had not been authorized by the statute to search the storage trailer, that the agents had failed to prove consent or probable cause and that the storage trailer was not an "open field," excluded from Fourth Amendment protection. *The court also found that the locked storage trailer was outside the curtilage of the home. Id.*

The facts in this case are in Mr. Shates' disfavor. In this case the grow structure is analogous to the storage trailer in the *Santa Maria* case. In actuality, Mr. Shates used the travel trailer as his primary residence, using both the grow structure and the trailer for restroom facilities. If the grow structure does harbor any intimacies of daily life, it is nothing more than an outhouse 108 feet distant from the trailer. In addition, the grow structure was primarily used for growing marijuana, an illegal and therefore unprotected activity, and not one of those associated with the intimate activities of daily living.

Therefore, in making a curtilage determination under the four part *Dunn* analysis, the two locations in question—the log and the grow structure—must be observed in relation to the trailer. An improper analysis, and one set forth by the Defendant, would be to consider the log in relation to the grow structure/outhouse, since the function of the grow structure (notwithstanding the illegal activities therein) brings it within the definition of an outbuilding.

### APPLICATION OF FACT TO LAW: DUNN ANALYSIS

### 1) The proximity of the area claimed to be curtilage to the home

#### a) The log

■ The log was located approximately 150 feet from Mr. Shates' trailer. This distance puts the log further than the barn was located in *Dunn*, and even further than the shop was located in *Traynor*. To this Court's knowledge, no modern authoritative case has recognized even an outbuilding at

this distance to be within the curtilage. This also applies to the second position at the stumps where S.A. Russell detected the odor of marijuana for the second time. (Russell Decl. ¶ 20.)

Also note that in *U.S. v. Kerr*, 876 F.2d 1440, 1442 (9th Cir.1989) the officer smelled marijuana from 150 feet distant and followed that "trail" to the suspected structure:

> By far the most incriminating piece of evidence was the odor of marijuana emanating from Kerr's premises. Royster claimed that he could smell the odor of fresh marijuana coming from the direction of Kerr's shed. While it seems quite remarkable that the odor of fresh marijuana could escape through a small vent in an otherwise enclosed, well-insulated building, travel in excess of 50 yards over thick vegetation and still be detectable to the human nose, this Court is not at liberty to disturb the credibility determinations made by the magistrate and the district court.

*Kerr,* 876 F.2d at 1444.

It was at these distant locations that S.A. Russell and the other Agents had a good sense that there was marijuana in the area. Based on the wind direction, he could have crossed around the property and found no odor on the other side. That information, in addition to the informant's tip, would be enough to secure a search warrant. *See, e.g., Depew,* 8 F.3d at 1426 (search warrant obtained solely based on tip and smelling odor of marijuana at 50 feet from residence). Note that in *Depew,* the evidence was suppressed, since the officer had been within the curtilage when he obtained his olfactory information.

The instant case is distinguishable from *Depew,* 8 F.3d at 1424 (9th Cir.1993), the Ninth Circuit case finding that agents entered the curtilage. The Court based its holding in part on the determination that the agents had no objective information that the garage and driveway were being used for illegal activity. *Id.* at 1427. In that regard, the Court noted that the only prior information was a tip from an informant; his information was based on hearsay from another source, and there was no showing that that

source was reliable. *Id.* at 1428–1429. In the instant case, the source was an informant who had made the observations personally, and who Agent Russell knew to be reliable. PC–1.

The *Depew* Court also based its finding of curtilage by examining the steps Depew took to ensure his privacy, and found it significant that Depew posted "no trespassing" signs. As noted above, there were no such signs in the area where the agents entered the eastern open field, and where neighbors and passersby would have access to the field. As discussed in Section D below, Shates's *subjective* expectation of privacy due to his selection of a relatively remote location, is not relevant to the curtilage determination.

### 2) Whether the area is included in an enclosure surrounding the home

#### a) Fences

The fences are largely irrelevant. "The Court expressly rejected the argument that the erection of fences on an open field—at least of the variety involved in those cases and in the present case—creates a constitutionally protected privacy interest." *Dunn,* 480 U.S. at 304, 107 S.Ct. at 1141 (citing *Oliver,* 466 U.S. at 182–83, 104 S.Ct. at 1743–44). The fences are run down and broken, and are not intended to exclude vision or humans.

#### b) The log

The log where the agents first detected the odor of marijuana was not within an enclosure surrounding the home. It was in the tree line and the grass was not mown. Even the investigator Chris Reynolds who visited the property on July 9, 1992 (after the Defendant had an opportunity to tamper with the premises) remarked that the log was thirty feet outside of the mown area. (Reynolds Decl. ¶ 4.)

#### c) The grow structure

The grow structure, as the Defendant states, was indeed part of what may be called a "compound." However, the operative wording in this prong of the test is "enclo-

sure" and accordingly the relative location of the structure in relation to the overall layout is not as important as some other factors.

Looking at the pictures, the grow structure could be considered "enclosed" on the southerly side by the K structure; "enclosed" on the western side by the ingress and egress route to and from the trailer; "enclosed" by the generator shed on the northerly side; "enclosed" by trees on the north and west. But, this overly-broad interpretation should not be applied, since the enclosure usually has to be an objective manifestation of an intent to keep something private (like a fence). Moreover, the enclosure is incomplete—the eastern side of the grow structure (the side the agents approached from) is unfenced and completely open.

The entire "compound" area could also be considered an enclosure of sorts, but this is also not a commonly accepted view of enclosure. The term "compound" is somewhat misleading, since it evokes images of a "Swiss Family Robinson" living arrangement. Whatever "compound" exists, the visual evidence makes it very clear that the "compound" is in quite a state of disrepair, belying the assertion that it was used frequently. The wear marks on the ground and other evidence give every indication that the trailer is the only living structure. However, if this were in fact a compound put to all the uses which Shates alleges, the officers would not have obtained any of the information on which the warrant was based from within that compound area. The recognizable "compound" (this includes structures but not gardens) forms a wheel. The officers obtained all relevant information from outside this wheel.

### 3) The nature of the uses to which the area is put.

#### a) The log

The log was in an area of wilderness.

### b) The grow structure

As noted in *Dunn*, it is especially significant that the law enforcement officials possessed objective data indicating that the grow structure was not being used for intimate activities of the home. The informant's observations on three separate occasions that the grow structure was being used for the manufacture of drugs led the Agents to the property. Once on the property, the agents detected the odor of marijuana emanating from the direction of the structures. As Russell approached the shed, he heard the sound of ballasts. S.A. Russell continued to accrue more objective data as he approached the grow structure which indicated to him, based on his extensive experience and training, that the grow structure did not "harbor those intimate activities associated with domestic life and the privacies of the home." *Calabrese*, 825 F.2d at 1350.

The fact that the building housed a working toilet certainly did not transform the building into a "home" for curtilage purposes.[8] Using that logic, any business or commercial building (such as the grow building here) that contains a functioning toilet could be deemed a home, a result which is obviously inconsistent with Fourth Amendment tenets and the whole point of the curtilage analysis. *See, United States v. Brady*, 734 F.Supp. 923, 929 (E.D.Wash.1990), *affirmed*, 993 F.2d 177 (9th Cir.1993) (bunkhouse deemed not closely associated with legitimate family activities and thus outside curtilage, where used primarily for marijuana grow operation, and despite fact that the front room was used to store canning supplies and as an occasional playroom for children). *Also see, Van Damme*, 48 F.3d at 464 (greenhouse housing marijuana not within curtilage of home; "the cultivation of crops, such as marijuana, is one of those activities that occur in 'open fields,' not an intimate activity of the home").

---

8. Shates's claim that this toilet was used exclusively is subject to question. The record shows that Marsha Freitas went into the restroom in the trailer that day without asking to use the toilet in the grow building, or without even stating that one was there. In addition, a pipe was hooked up to the trailer's toilet facility and led a distance away into a ravine. Its odor was consistent with that of a septic pipe.

#### c) Class K Structure

Shates's contention that he had been using the Class K structure as his living quarters before that is also questionable. It certainly was not being used for living purposes when the warrant was served. Further, Shates's admitted use of the building as a marijuana drying and manicuring area was inconsistent with living activities. Finally, the condition of the structure itself (as depicted in Exh. P, for example), was not conducive to residency.

It is irrelevant that the Agents began their search looking for methamphetamine and came up with marijuana—drugs are drugs.

#### 4) The steps taken by the resident to protect the property from people passing by.

##### a) The log

The log was in the wilderness—there was no evidence whatsoever indicating that the log was a part of the living area. There were no steps to prevent observations from the point of the log. There were no steps to prevent access to the log from the outlying wilderness. Wishfully thinking that no one would approach from the wilderness is not enough to indicate an expectation of privacy. Similarly, the fact that the Roderick Ranch was located in a remote rural location should not be considered as a step taken by the resident to protect the property from people passing by (discussed below).

##### b) The "Compound"

There were no fences or obstructions to prevent a fairly clear view on to the Roderick Ranch from passerby on Clow Ridge Road or from the woods.

The Defendant argues that choosing a remote location is a step taken by a resident to protect the property from people passing by. However, this would be an incorrect analysis—selecting a remote residence only limits the number of people that pass by. Living in a remote rural area in of itself does nothing to prevent people who do pass by from seeing in. As far as case history is concerned, *Depew* is the only case which introduces remoteness as a factor in the fourth part of the *Dunn* test. Every other case relies on visibility from points off of the property.

"Respondent did little to protect the barn area from observation by those standing in the open fields." *Dunn,* 480 U.S. at 302, 107 S.Ct. at 1140. The Supreme Court discussed the *possibility* that those standing in open fields could observe activities in the curtilage without entering into a formula which took into account the *probability* of a person standing in open fields adjacent to the curtilage.

Other examples include: "[T]he defendant's residence and outbuildings were largely obscured from the view of persons traveling on the adjacent county road." *U.S. v. Domitrovich,* 852 F.Supp. 1460, 1471 (E.D.Wash.1994). "The outbuilding was easily visible from the open fields surrounding Brady's property." *U.S. v. Brady,* 993 F.2d 177, 179 (9th Cir.1993).

Moreover, if remoteness were to become a factor in this analysis, there would be two possible outcomes. One, there would be an increase in the production of illegal drugs in rural counties. Two, there would be an increase in the need to grant search warrants based on less information, since a person in absolute isolation could conceivably manufacture drugs without detection for years. These are two policies which society (especially rural communities) would not wish to encourage. A criminal should not be able to escape the long arm of the law by taking his unlawful activities to the back country.

Finally, access to Clow Ridge Road was certainly not within the control of Shates. Many private owners and government agencies had access to those gates. People who pass by on Clow Ridge road only have to step over a broken down cattle fence which extends for several hundred feet. Those coming from the wilderness could conceivably walk right up to the log without seeing any human signs.

### CONCLUSION

The information obtained by the agents before and during the entry on the Roderick ranch on the night of May 28 established that the areas of the log and stumps, as well as

the area on the east side of the single-story building, were not areas harboring "those intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at 301 n. 4, 107 S.Ct. at 1139 n. 4.

Under the totality of the circumstances, Clow Ridge Road and the area of the log and stumps, where the agents obtained probable cause to believe that marijuana was being grown in the area of the single-story building, was outside the curtilage. Consequently, Shates' Fourth Amendment rights were not implicated by the agents' warrantless entry into these areas, and all observations from these areas were properly included in the search warrant affidavit.

Similarly, by the time the agents made the approach to the single-story building, they had accumulated even more grounds to believe that they were not intruding into the curtilage of the property. Although the agents already had probable cause for the warrant at this point, their observations along the east side of the building were made outside the curtilage and were properly included in the affidavit.

Therefore, it is hereby FOUND that the curtilage extends only to the trailer and the immediate surroundings. It is further FOUND that the Agents were well within the limits allowed under the Fourth Amendment.

Because the facts supporting probable cause to believe that marijuana was being cultivated on the Roderick ranch property were obtained outside the area in which Shates had a reasonable expectation of privacy, it is recommended that his motion to suppress the evidence seized as a result of the search warrant should be denied.

Dated Oct. 27, 1995