UNITED STATES of America,
Plaintiff–Appellee,

v.

John Louis VAN DAMME,
Defendant–Appellant.

Nos. 93–30325, 93–30338.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1994.

Decided Feb. 27, 1995.

Terry Wallace, Wallace Law Office, Missoula, MT, for defendant-appellant.

Bernard F. Hubley, Asst. U.S. Atty., Helena, MT, for plaintiff-appellee.

Before POOLE, BRUNETTI, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This search and seizure case involves a helicopter view of greenhouses, a view through a fence, and execution of a subsequently obtained search warrant without having the papers along.

## I. Facts

Van Damme lived in a house in rural Montana. He grew marijuana, over two thousand plants, in three large greenhouses. The greenhouses, shaped like Quonset huts and made of translucent plastic, were separated from the rest of his property by a high board fence. The fenced off greenhouse compound was 204 feet away from Van Damme's house.

An unidentified individual, called the "citizen informant" in the record, went to Van Damme's house to ask if Van Damme had permission for a water line running to his property from a well on adjacent property.

The citizen noticed marijuana growing in one of Van Damme's greenhouses, and told the police. County police and the Drug Enforcement Agency flew over the greenhouses in a helicopter, and looked through the board fence into the open doors of the greenhouses, to verify that Van Damme had marijuana growing there. Then they obtained and executed a search warrant. Van Damme's appeal is based on claimed defects in the search and seizure of the evidence used to convict him.

## II. Analysis

A. Probable cause.

Van Damme argues that the search warrant was issued on insufficient probable cause, because the knowledge which the affiants obtained by flying over his greenhouses in a helicopter and peering through the fence could not permissibly be used.

1. The helicopter.

Van Damme argues that the helicopter flight was below FAA minimums, the finding of fact to the contrary was clearly erroneous, and he had an expectation of privacy from such searches.

Judge Lovell, in his careful and precise findings of fact, found that the helicopter flew above FAA minimum heights, always above 500 feet, and that "[a]t no time did the helicopter fly directly above the Van Damme residence." He found that the front doors of all three greenhouses were open, so the police officer looking out of the helicopter was able to identify marijuana growing in them through the viewfinder of his camera, on which he had a 600 mm lens. The exhibits, which we have examined, confirm that the large doors, when open, allow an easy and full view of the interiors of the greenhouses.

■ We do not have to reach the question of whether a view from the air into Van Damme's home or curtilage would have violated his Fourth Amendment right to privacy. The district court found, correctly as we explain below, that the marijuana greenhouses were not within the curtilage, and it is unchallenged that the helicopter did not fly over Van Damme's home, 823 F.Supp. 1552.

The permissibility of this search necessarily follows from *United States v. Broadhurst*, 805 F.2d 849 (9th Cir.1986). The only distinction we can see is that in *Broadhurst*, the police view "was unenhanced by any equipment," *id.* at 855, but in the case at bar, the view was enhanced by a 600 mm telephoto lens on the police officer's camera. *Dow Chemical Co. v. United States*, 476 U.S. 227, 238, 106 S.Ct. 1819, 1826–27, 90 L.Ed.2d 226 (1986), establishes the relevant distinction as being between conventional equipment commonly available to the public and without the ability to penetrate walls or windows, and highly sophisticated surveillance equipment not generally available to the public. A 35 mm camera with a 600 mm lens is a kind of vision enhancer commonly available to the public and used typically for telephoto landscape photography. Such helicopter surveillance as occurred here, not of an area immediately adjacent to a private home, *see id.* at 237 n. 4, 106 S.Ct. at 1826 n. 4, does not amount to a search prohibited by the Fourth Amendment.

■ Van Damme argues that the district court should have found that the helicopter flew below 500', evidently the FAA minimum. Van Damme so testified, and presented testimony that the distance was 210' to 310'. His argument is that because no expert testified to the contrary, and his expert's testimony was admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the judge's inquiry had to be limited to what experts deemed reliable, not what the judge thought.

The judge heard testimony by one of the detectives that they flew above 500'. He listened to the cross examination of Van Damme's "expert witness," who testified to the contrary based on calculations from the photographs. The critical question was how the expert computed the angle which yielded his 210' computation. Here is the witness's response:

A. Computer does it, I don't.

Q. You don't know how the computer does it?

A. Oh, yes. Using various things, like the law of cosines and stuff, and subtracting your differences in x, your differences in y, and differences in z, you can get all those—compute all those angles. It's like—it's the Pythagorean theorem with three dimensional data, $x^2 + y^2 + z^2$, that thing, the square root of that gives you the distance, and then the angle is computed by the sine of the angle.

While Van Damme characterizes this answer as perhaps exhibiting a "lack of pedagogical skills," Judge Lovell properly exercised his own judgment on what he called the "purported" expertise of the witness, and found that the witness' computation was not sufficiently established. We call testimony "expert" testimony as a short way to refer to the body of law allowing some witnesses to testify to opinion as well as fact. Much expert testimony is admissible but not persuasive, and some is admissible but not believable. A judge finding the facts properly exercises independent judgment, as Judge Lovell did here.

B. *The fence.*

The DEA Agent and police officer trespassed on Van Damme's land in the middle of the night, walked through Van Damme's forest, and climbed over Van Damme's wire fence, to get to the marijuana growing area they had identified from the air. They stopped at the board fence, which was twelve feet high, and looked through a crack between the boards. The moon was full and the doors were wide open, so they could see the marijuana inside. The exhibits show that the spaces between the boards are in many places wide enough so that daylight shows through, and the doors are the full height and width of the greenhouses.

■ To decide whether land is curtilage or an open field, a court must examine four factors:

[T]he proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987); *United States v. Traynor,* 990 F.2d 1153, 1156 (9th Cir.1993). Judge Lovell carefully reviewed the four factors listed in *Dunn.* He found that the greenhouse compound was over 200 feet from the home. The wire fence surrounding the home and greenhouse compound was a perimeter fence enclosing several acres, not a fence surrounding only the home and curtilage. The board fence surrounding the greenhouse made it a distinct portion of the property quite separate from the residence. The greenhouse compound lacked any "indicia of activities commonly associated with domestic life." The cultivation of crops, such as marijuana, is one of those activities that occur in "open fields," not an intimate activity of the home. *See Oliver v. United States,* 466 U.S. 170, 179, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). The officers were not within the curtilage when they saw the marijuana through the fence and greenhouse doors, and neither were the greenhouses.

■ Obviously Van Damme intended to shield his activity in the greenhouses from easy viewing by the public. He was using the greenhouses to commit a felony. Their separation from publicly accessible land and the high board fence leave no doubt about his desire for privacy. Van Damme argues that this demonstrated purpose of maintaining privacy requires that the greenhouses be treated as curtilage. An intent to maintain privacy, however, does not necessarily establish a constitutionally protected area of privacy.

■ Van Damme did not have a constitutionally protected right to maintain privacy in "open fields," outside his home and curtilage. The place where the officers stood, outside the fence, was open fields, outside his curtilage. "Curtilage" is an ancient English law term used to mark off an area outside the walls of the home as being within the geographic area in which theft at night amounts to burglary. Blackstone said,

For no distant barn, warehouse, or the like, are under the same privileges, nor looked upon as a man's castle of defense;

nor is a breaking open of houses wherein no man resides, and which therefore for the time being are not mansion-houses, attended with the same circumstances of midnight terror.... And if the barn, stable, or warehouse be parcel of the man-sionhouse, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall.

IV Blackstone's Commentaries 225 (1769). The protection of "houses" in the Fourth Amendment extends to curtilage, which means the land "immediately surrounding and associated with the home ... to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 (citations omitted). Blackstone's reference to which kinds of nighttime thefts cause the same circumstance of "midnight terror" as an entry into the home gives additional assistance in locating the boundary of "curtilage." The greenhouses were fenced off, not just from the public, but also from the residential portion of Van Damme's property, and were entirely separate from the places of intimate activity associated with the home.

We do not need to reach the question of whether the interior of the greenhouses constituted "open fields." A 1924 decision written by Justice Holmes, which happened to concern an open field, held that "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (citation omitted). The phrase "open fields" was used in *Hester* because the case happened to involve open fields, but the reasoning was broader. The doctrine is based upon a literal reading of the Fourth Amendment, which says that the protection against unreasonable searches and seizures extends only to "persons, houses, papers, and effects." U.S. Const. amend. IV. Because the Founding Fathers rejected James Madison's proposal to include "and their other proper-

ty" in the list of protected areas, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* 466 U.S. at 176–78, 104 S.Ct. at 1740–41.

In 1984, the Supreme Court established the "continuing vitality" of this doctrine. *See Oliver*, 466 U.S. at 173, 104 S.Ct. at 1739 (1984). The reasoning does not depend on the openness of the fields, or whether the unprotected area is a field at all. "An open field need be neither 'open' nor a 'field.'" *Id.* at 180, n. 11, 104 S.Ct. at 1742, n. 11.

■ Nevertheless, it is well established that Fourth Amendment protection applies to enclosed places which are not "persons, houses, papers, and effects," such as enclosed commercial buildings, *Dow Chemical*, 476 U.S. at 236, 106 S.Ct. at 1825–26, and a trailer outside the curtilage used as a storage shed, *United States v. Santa Maria*, 15 F.3d 879 (9th Cir.1994).

We do not need to solve the enigma in this case. The unfortunate use of the term "open fields" in this body of law causes misunderstanding and confusion, and should be replaced by a term which means what is says, such as "unprotected area." In this case, the observation was made from "open fields," outside the curtilage, and the area observed was outside the curtilage, so under *Traynor*, 990 F.2d at 1159, the Fourth Amendment did not entitle Van Damme to privacy from the observation.

C. The warrant.

The Fourth Amendment says that a search warrant must particularly describe "the place to be searched, and the persons or things to be seized." The one issued in this case described the place adequately, and was issued on probable cause, so the police executing it had a right to go inside Van Damme's house and his greenhouse. But the search warrant did not tell the officers executing it what to seize. In the place on the form for listing what the officers were to seize, the search warrant said "SEE ATTACHMENT #1." But nothing was attached. On its face, the warrant is therefore insufficient.

The government correctly points out that there was an attachment to the application for the warrant describing what the officers were looking for:

Evidence of the cultivation of marijuana, including but not limited to, marijuana, marijuana residue, wiring and electrical fixtures, Halide lights, ballasts, hydroponic and/or organic growing materials, heaters, and drying equipment; weapons; documentary evidence including, but not limited to, drug records in the form of computers, computer accessories and its/their contents, address books, notations with names and telephone numbers, notations with amounts of money figures, monies, receipts regarding the acquisition of growing equipment, photos, etc., relative to the possession, cultivation, and distribution of dangerous drugs, i.e., marijuana.

There was no testimony or other evidence, however, that the application was taken along on the search, or that any of the officers performing the search had a copy of the attachment with them. The DEA agent who had obtained the warrant had helped prepare the attachment, but there was no testimony or other evidence that he told anyone else executing the search what it said.

■ The warrant need not necessarily describe the things to be seized, if the application for it does, and the officers executing the warrant have the application with them. In that circumstance, the officers can read the list of things to be seized while they are searching, and show the list to the person from whom the seizures are made. *In re Matter of Seizure of Property Belonging to Talk of the Town Bookstore, Inc.,* 644 F.2d 1317, 1318–19 (9th Cir.1981); *United States v. Towne,* 997 F.2d 537, 548 (9th Cir.1993). This doctrine, however, cannot save the seizures of things not obviously contraband here, because there was no evidence that the officers took the attachment along on the search. *United States v. Stubbs,* 873 F.2d 210 (9th Cir.1989).

The government argues that this was a mere "technical violation," a failure to photocopy and staple a copy of attachment # 1 to the warrant as well as to the application. We cannot agree. The Founding Fathers had a judgment to make, whether the officers executing a search warrant should take anything they liked, or only what was described with particularity in a warrant. They decided upon the warrant. The practical significance of not attaching the list of things to be seized was that, so far as the record shows, the officers had no document telling them what to take, and Van Damme could look at no document specifying what the officers could take. That is not just a technical failure to photocopy and staple. It is a transfer of power to limit the search from the neutral magistrate, where the Founding Fathers put it, to the police.

We have looked at the inventory of what was taken in the search to see whether it is circumstantial evidence that the officers used the list in the missing "attachment # 1." It is not. The inventory includes boating magazines, cough medicine, a box of Tampax, chainsaws, automobile jacks, hand tools, a tire and wheel, and a soldering iron. It may have been worth examining some of these items for traces of marijuana, corroboration of the inference that Van Damme occupied the house, or that a female associate participated in the marijuana business, as the government now argues. But the inventory of what was taken does not show that anyone executing the search warrant relied upon the list of items to be seized.

The government's brief does not argue the "good faith" exception to the exclusionary rule, *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), so we need not decide whether that would save the seizures in the house. *See United States v. Luk,* 859 F.2d 667, 677 (9th Cir.1988). Nor has the government argued harmless error, or presented us with a transcript of the trial or any other basis from which we could infer that the error was harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Studley,* 783 F.2d 934, 941 (9th Cir.1986).

■ Because we have concluded that probable cause was established for issuance of the warrant, and that it adequately described the places to be searched, our conclusion would not require suppression of contra-

band in plain view, such as the marijuana in the greenhouses. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *G & G Jewelry, Inc. v. City of Oakland,* 989 F.2d 1093, 1101 (9th Cir.1993). The district court shall, on remand, determine which evidence must be suppressed because of the lack of particularity, and which can be admitted because it was contraband in plain view when the officers performed the search.

Because we VACATE Van Damme's judgment of conviction, which included the forfeiture, we do not reach the issues raised by his challenge to forfeiture.

VACATED and REMANDED.