**UNITED STATES of America,
Plaintiff,**

v.

**Timothy DELLAS, Defendant.**

**No. CR 03–0226 MHP.**

United States District Court,
N.D. California.

Feb. 9, 2005.

Ian G. Loveseth, San Francisco, CA, for Defendant.

Kyle F. Waldinger, U.S. Attorney's Office, San Francisco, CA, for Plaintiff.

### MEMORANDUM AND ORDER

### Re: Motion to Suppress

PATEL, District Judge.

On July 22, 2003, a grand jury indicted defendant Timothy Dellas for violations of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* The two-count indictment charged defendant with knowingly and intentionally manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(vii) and with possession of marijuana with intent to distribute in violation of the same provisions of the CSA. Defendant now moves to suppress evidence obtained in the search of the property located at 3500 Elk Ridge Road in Humboldt County, California, asserting that this search violated his rights under the Fourth Amendment of the United States Constitution. On August 5, 2004, the court found that defendant had made the preliminary showing required to establish that he was entitled to an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and the court heard testimony from a number of witnesses on October 14, 2004, November 5, 2004, and November 23, 2004. Having considered the parties' arguments and the evidence presented at the *Franks* hearing, the court enters the following memorandum and order.

### BACKGROUND

#### I. The Premises Searched

On June 9, 2003, the Humboldt County Sheriff's Department, assisted by agents of the Federal Bureau of Investigation ("FBI") and the federal Drug Enforcement Agency ("DEA"), executed a search warrant at 3500 Elk Ridge Road, a property located in an unincorporated area of Humboldt County, California. The warrant authorized the search of two adjacent parcels identified as Assessors' Parcel Numbers ("APNs") 220–301–020 and 221–240–020. Opp'n, Exh. 1 at 1. The parcels total approximately forty acres in area and are located in a rural residential area characterized by steeply sloped terrain and moderate-to-heavy vegetation cover. *See generally* Nov. 5, 2004 Tr. at 118–60 (Testimony of Daniel Weaver). The warrant

explicitly references three structures located in a natural clearing on the property: a round structure that was used as a part-time residence by defendant and a number of other individuals ("Building 1"); a large, rectangular wooden structure used to grow marijuana and referred to as the "grow shed" ("Building 2"); and a small round structure that housed a diesel generator. Opp'n, Exh. 1 at 1–2. The residence and the grow shed are separated by a distance of approximately 120 feet. Def.'s Exh. H ¶ 4 (Decl. of Daniel Weaver).

These structures are accessed via a private dirt road that intersects with Elk Ridge Road approximately three-fourths of a mile from the clearing in which the buildings are located and ends in front of Building 1. Nov. 5, 2004 Tr. at 125–26 (Weaver Testimony).[1] At the time that the premises were searched, a locked gate located approximately 300 feet from Elk Ridge Road blocked public vehicular access to the road. Id. However, because no fences abutted the gate on either side, pedestrians could access the property by walking around the gate along the shoulder of the road. Id. at 136; Oct. 14, 2004 Tr. at 47–48 (Testimony of Wayne Hanson). Beyond the gate, three signs, the first reading "Private Road, No Trespassing," the second reading "Private Driveway, Keep Out," and the third reading "Beware of the Dog," were present when an investigator retained by defendant visited the property on June 18, 2003. Nov. 5, 2004 Tr. at 119, 137–39 (Weaver Testimony).

In addition to the structures located in the clearing, a number of other structures not referenced in the warrant are located on or near the property. Among these structures is a two-story, garage-like building located approximately one-half mile from the clearing ("Building 3"). Id.

at 122, 125. Access to this structure is provided by another private dirt road that intersects with the road to the clearing near Elk Ridge Road. Id. at 125. A second locked gate blocks vehicular access to that road. Id. at 126.

At all times relevant to this motion, the parcels identified in the search warrant were owned by Edward Brown, a resident of Buffalo, New York. Oct. 14, 2004 Tr. at 10–17 (Testimony of Edward Brown). At the Franks hearing, Brown testified that he had acquired the parcels in 1998 from John Mahoney, a former student in Brown's high school English class, in what appears to have been a gratuitous transfer. Id. Despite being the record owner of the property, Brown testified that he played no active role in its management and that he did not make any mortgage payments or pay any property taxes on the land. Id. at 17, 28–29. Moreover, while Brown also testified that he received monthly payments in the amount of $300 that he believed to be rental income from the property, he never learned the identity of the tenant who was the purported source of those payments. Id. at 18–19.

Apparently, there was no identifiable "tenant" residing at the property. Rather, according to defendant, the Elk Ridge Road property was used by a "cooperative" formed for the purpose of growing marijuana. Nov. 5, 2004 Tr. at 64 (Testimony of Timothy Dellas). As a member of the cooperative, defendant acted as a caretaker of the property and performed various maintenance tasks on the premises. Id. at 66, 99, 110. Often, these duties required that defendant stay overnight at the property, and defendant testified that he slept on the premises approximately two to three nights per week during the

---

1. Elk Ridge Road is a private road used by a number of households in the area. The nearest public road, Briceland Road, is located approximately three miles from the property. Nov. 5, 2004 Tr. at 131–32 (Weaver Testimony).

ten-month period that preceded his arrest, typically spending the night in a bedroll on the floor of Building 1. *Id.* at 71, 81. Defendant further testified that Building 1 had "all of the appurtenances of a household," including a fireplace, a refrigerator, and a sink, *id.* at 81, and that he and other members of the cooperative prepared meals and stored food, clothes, and other belongings in the structure, *id.* at 83. However, nothing in the record suggests that defendant or any other member of the cooperative maintained a permanent residence at the Elk Ridge Road property. *See id.* at 81–84.

The circumstances under which that cooperative obtained permission to use the Elk Ridge Road property remain unclear. According to defendant, one of the members of the cooperative, who defendant identified as the *de facto* owner of the property, gave the cooperative "implicit" permission to use the premises for the purpose of growing marijuana. *Id.* at 90–93. However, because defendant refused to provide the names of other members of the cooperative despite being instructed by the court to do so, the record is silent as to the identity of that individual. In any event, defendant professed to have no knowledge of any arrangement that the cooperative might have made to rent the property from Edward Brown, *id.* at 90, 92, and Brown was not aware that his property was being used by the cooperative, Oct. 14, 2004 Tr. at 24–25 (Brown Testimony).

## II. *Investigative Activities*

While the record is unclear as to how the cooperative obtained permission to use the Elk Ridge Road property, the fact that the property was used for the purpose of growing marijuana is undisputed. The Humboldt County Sheriff's Department was first alerted to this possibility when a confidential informant contacted Sergeant Wayne Hanson on May 1, 2003. Opp'n, Exh. 1 at 3. The informant, who Hanson identified as a local resident concerned about the environmental impact of the diesel fuel stored on the property, reported that she[2] had walked onto the property in February or March 2003 and had observed a 70–kilowatt diesel generator used to supply power to an indoor marijuana growing operation. *Id.* The resident also reported that she smelled the odor of marijuana on the premises and that a structure on the property (which appears to have been Building 2) contained approximately ninety high-intensity "grow lights." *Id.* However, she was unwilling to disclose how she gained access to the interior of that structure. *Id.* On May 13, 2003, Humboldt County Deputies drove to the entrance of the property and determined its location using a handled global positioning system ("GPS") unit. *Id.* at 4. Upon receipt of this information, Bureau of Land Management ("BLM") Special Agent Laurel Pistel determined the address corresponding to the deputies' location to be 3500 Elk Ridge Road. *Id.*

At approximately 1:00 a.m. on May 30, 2003, Hanson and two other Humboldt County Deputies, Mark Peterson and Joel Dean, returned to the property to investigate further. *Id.* at 5; Oct. 14, 2004 Tr. at 46–47 (Hanson Testimony). Equipped with night vision goggles, the deputies walked down the dirt road leading to Buildings 1 and 2, around the locked gate, and continued up the road for approximately three-fourths of a mile, at which point the diesel generator located in the clearing became audible. Oct. 14, 2004 Tr. at 47–48. According to his testimony, Hanson then walked approximately thirty

---

**2.** Although the gender of the confidential informant has not been disclosed, the court will refer to the informant using feminine pronouns for the sake of convenience and clarity.

to sixty feet ahead of the other two deputies and stopped approximately 120 feet from Building 2. *Id.* at 48 (Hanson Testimony); *see also id.* at 102, 114 (Testimony of Mark Peterson). Hanson further testified that from that point in the road, he donned his night visions goggles, allowing him to see what he described as an "extremely bright light" coming from the corner of that structure. *Id.* at 48, 75–76 (Hanson Testimony)

As Hanson was standing in the road observing Building 2, a car approached the deputies from the direction of Elk Ridge Road. *Id.* at 50; Opp'n, Exh. 1 at 5. The deputies concealed themselves along the side of the road until the car had passed. Oct. 14, 2004 Tr. at 47–48 (Hanson Testimony). After the vehicle had parked, the officers left the area. *Id.* According to Hanson, he did not see any other structures on the property during the search. *Id.* at 49, 78–79.

Testimony at the *Franks* hearing subsequently established that the location from which Hanson claims to have observed Building 2 is located approximately 240 feet from Building 1, the residence. *Id.* at 51. From that vantage point, Building 1 is obscured from view by a hill that rises along the left-hand side of the road. *Id.* at 52. In addition, testimony regarding the configuration of the property made clear that this point in the road is located outside of the natural clearing surrounding Buildings 1 and 2. *See* Nov. 5, 2004 Tr. at 140–45 (Weaver Testimony).

### III. *Execution of the Warrant*

Based on the evidence gathered on the night of May 30, 2003, the Humboldt County Superior Court issued a warrant authorizing the search of the two parcels that the officers had identified as corresponding to the address of 3500 Elk Ridge Road. Opp'n, Exh. 1. The warrant was supported by Hanson's affidavit, which set forth the information provided to him by the confidential informant and recounted his own observations from the May 30, 2003 search. *Id.* at 3–5.

On the morning of June 9, 2003, deputies from the Humboldt County Sheriff's Department and agents of the FBI and DEA executed the warrant. The search of Building 2 yielded a total of 2,412 marijuana plants in several grow rooms, as well as twenty-one pounds of packaged marijuana. Opp'n at 3. In searching Building 1, the officers found an additional 1,593 marijuana clones in one of the bedrooms. *Id.* at 3–4. Defendant was also found in Building 1, where he had been sleeping in the living area of that structure, and was taken into custody. *Id.* at 4.

Later that day, Hanson left the clearing around Buildings 1 and 2 and drove in the direction of Elk Ridge Road until he found the road leading to Building 3. Oct. 14, 2004 Tr. at 64–65 (Hanson Testimony). He walked around the locked gate blocking vehicular access to that road and continued until he arrived at Building 3. *Id.* at 68. Using a handheld GPS unit, Hanson relayed the GPS coordinates of his location to BLM Special Agent Pistel. *Id.* at 66; Pistel Decl. ¶ 2. Pistel then manually plotted these coordinates on a 7.5–minute United States Geological Survey ("USGS") topographic quadrangle and concluded that Building 3 is located on one of the parcels identified in the search warrant, APN 220–301–020. Pistel Decl. ¶ 2; Oct. 14, 2004 Tr. at 129–35 (Testimony of Laurel Pistel). In reliance on Pistel's conclusion, Hanson and the other officers proceeded to search the structure. *Id.* at 89. The search yielded a total of 1,651 marijuana plants as well as a diesel generator, high-intensity grow lights, and other equipment typically associated with an indoor marijuana growing operation. Opp'n at 4.

Pistel's conclusion that Building 3 is located on one of the parcels identified in the search warrant has since been called into doubt. At the hearing held on November 23, 2004, Barry Kolstad, a licensed land surveyor, testified that he conducted a field survey of the relevant parcel boundary on July 3, 2004. Nov. 23, 2004 Tr. at 39 (Testimony of Barry Kolstad). In conducting that survey, Kolstad located the surveyor's monuments erected in 1972, when the property was originally subdivided, and in 1990, when a lot line adjustment was filed with the Humboldt County Assessor's Office. *Id.* Based on the location of these monuments, Kolstad concluded that Building 3 was located approximately 166 feet north of the northern boundary of APN 220–301–020 on one of two parcels owned by Yvonne Schad. *Id.* at 11–12, 15. Kolstad also raised a number of objections to the methodology that Pistel had employed in determining the location of the boundary between the Brown and Schad properties, citing the limited precision of the handheld GPS unit that Hanson used, the limitations of the assessor's parcel maps on which Pistel relied, and the crudeness of the method that Pistel used to compare these two sources of data (i.e., manually plotting the data on a topographic map). *Id.* at 37–40.

IV. *Defendant's Motion to Suppress*

On July 6, 2004, defendant moved to suppress the evidence gathered in the June 9, 2004 search of the Elk Ridge Road property on the ground that the evidence was obtained in violation of the Fourth Amendment of the United States Constitution. After hearing the testimony summarized above, the court invited the parties to submit supplemental briefs in the form of proposed findings of fact and conclusions of law. In his supplement brief and in the moving papers originally filed prior to the evidentiary hearings, defendant argues that the warrantless search conducted on the night of May 30, 2003 violated his Fourth Amendment right to be free of unreasonable searches and seizures and thus moves to suppress evidence gathered pursuant to the June 4, 2004 warrant, which issued in reliance on evidence gathered in the contested search. In support of this position, defendant first asserts that the three Humboldt County Deputies who searched the Elk Ridge Road property on the night of May 30, 2003 intruded upon the protected "curtilage" of that property in violation of the principles set forth in *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). In addition, citing *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), defendant contends that the deputies' use of night vision goggles violated his reasonable expectation of privacy in the premises searched. Alternatively, defendant argues that the June 4, 2004 search warrant should be invalidated on the ground that Sergeant Wayne Hanson included false and misleading statements in his affidavit submitted in support of that warrant. Finally, defendant contends that even if the search of Buildings 1 and 2 was constitutionally permissible, evidence obtained in the deputies' search of Building 3 must be suppressed because that structure is not located on either of the parcels identified in the June 4, 2004 warrant. The court considers each of defendant's arguments below.

*LEGAL STANDARD*

■ The Fourth Amendment protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV. "To invoke the protections of the Fourth Amendment, a person must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was one that society is prepared to recognize as reasonable." *United States v. Bautista,* 362 F.3d 584,

589 (9th Cir.2004) (quoting *United States v. Nerber,* 222 F.3d 597, 599 (9th Cir.2000)) (original alteration omitted). "Having made that showing, an individual is protected by the Fourth Amendment from warrantless searches in the absence of probable cause." *Id.* (citing *United States v. Alaimalo,* 313 F.3d 1188, 1193 (9th Cir. 2002); *Bailey v. Newland,* 263 F.3d 1022, 1029–1030 (9th Cir.2001)). Furthermore, "evidence which is obtained as a result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." *United States v. Wanless,* 882 F.2d 1459, 1465 (9th Cir.1989) (citations omitted).

To prevail on a motion to suppress, a defendant challenging the constitutionality of a search or seizure must first "demonstrate that he personally had a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Davis,* 332 F.3d 1163, 1167 (9th Cir.2003) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)) (internal quotation marks omitted). The Fourth Amendment expressly recognizes that individuals have a legitimate expectation of privacy in their own homes. U.S. Const. amend. IV; *see also Kyllo,* 533 U.S. at 31, 121 S.Ct. 2038 ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.") (citations omitted). In addition, courts have extended similar protections to a variety of other dwelling places, including hotel rooms, *Nerber,* 222 F.3d at 604, "makeshift" tents, *United States v. Sandoval,* 200 F.3d 659, 660–61 (9th Cir.2000), and the homes of others in which the person challenging the search or seizure is an overnight guest, *Minnesota v. Olson,* 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

The Supreme Court has also held that persons have a reasonable expectation of privacy in certain exterior areas of residential property. *See Oliver v. United States,* 466 U.S. 170, 178–80, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Nonetheless, the zone of Fourth Amendment protection afforded to a person's home does not necessarily extend to his or her property line; only the "curtilage"—i.e., "the land immediately surrounding and associated with the home"—is shielded from unreasonable searches and seizures. *Id.* at 180 & n. 11, 104 S.Ct. 1735 (citing 4 William Blackstone, *Commentaries* *225); *see also United States v. Barajas–Avalos,* 377 F.3d 1040, 1057 (9th Cir.2004). What lies beyond the boundary of the curtilage are "open fields" that government agents may enter without regard to the constraints imposed by the Fourth Amendment. *Oliver,* 466 U.S. at 179–80, 104 S.Ct. 1735; *Barajas–Avalos,* 377 F.3d at 1056–57.

There is no fixed formula for drawing the line between the curtilage and "open fields." Nonetheless, in *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court identified four factors that are relevant to this determination: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301, 107 S.Ct. 1134 (citations omitted). At the same time, the *Dunn* Court cautioned that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* The government bears the burden of proving that the search was not within the curtilage of a

defendant's home. *See United States v. Johnson*, 256 F.3d 895, 901 (9th Cir.2001) (en banc).

## DISCUSSION

### I. *Intrusion upon Curtilage*

■ In moving to suppress, defendant first argues that the three Humboldt County Deputies who conducted the warrantless search the Elk Ridge Road property on the night of May 30, 2003 intruded upon the curtilage of that property in violation of defendant's Fourth Amendment rights. Of course, in order to have "standing" to assert this claim, defendant must not only establish that he had a subjective expectation that his activities on the property would remain private; he must also prove that this expectation "was one that society is prepared to recognize as reasonable." *See Bautista*, 362 F.3d at 589. While the application of this standard to the instant motion raises a number of difficult questions of Fourth Amendment law, the court will assume without deciding that defendant has standing to contest the deputies' search by virtue of his status as a

member of the cooperative and frequent overnight visitor to the property.[3] Accordingly, the court must determine whether the deputies' search of the exterior areas of that property was reasonable. In making this determination, the court applies each of the four "*Dunn* factors" to the facts of the case at bar.[4]

### A. *Proximity to the Dwelling*

The first *Dunn* factor is the proximity of the area claimed to be curtilage to the dwelling. 480 U.S. at 301, 107 S.Ct. 1134. Application of this factor requires a case-by-case inquiry into the nature of the property searched. *Johnson*, 256 F.3d at 902. As the Ninth Circuit noted in *United States v. Depew*, 8 F.3d 1424 (9th Cir. 1993), "there is not any fixed distance at which curtilage ends." *Id.* at 1427. Nonetheless, as a general rule, the extent of curtilage on rural properties such as the subject of the challenged search will be greater than in a densely populated urban setting. *See Johnson*, 256 F.3d at 902.

3. The court is reluctant to use the term "overnight guest" to characterize the nature of defendant's privacy interest in the property. In *Olson*, the Supreme Court made clear that overnight guests have a legitimate expectation of privacy in their host's property. 495 U.S. at 96, 110 S.Ct. 1684. However, as the government correctly points out, the *Olson* Court's use of the term "guest" presumed that the person objecting to the search was legitimately present in the "home" of an "identifiable host" with the authority to consent to the use of the residence. *United States v. Silva*, 247 F.3d 1051, 1055–56 (9th Cir.2001); *United States v. Armenta*, 69 F.3d 304, 308–09 (9th Cir.1995). Here, defendant has neither established that the Elk Ridge Road Property is anyone's "home" nor has he identified who the "host" that gave him permission to sleep in the residence was. For these reasons, the court refers to defendant as an "overnight visitor" rather than an "overnight guest."

4. Defendant also contends that he has a reasonable expectation of privacy in the Elk

Ridge Road property by virtue of the commercial activities that he carried out on the property—i.e., growing marijuana. While it is true that some courts have extended Fourth Amendment protections to the exterior areas of commercial properties, *see, e.g., Pearl Meadows Mushroom Farm, Inc. v. Nelson*, 723 F.Supp. 432, 439 (N.D.Cal.1989) (Aguilar, J.), Supreme Court precedent makes clear that any protection that the Fourth Amendment might afford to this so-called "commercial curtilage" is less than that which is afforded to the area surrounding a person's home. *See, e.g., New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (observing that a person's "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home") (citation omitted). Thus, at most, defendant's reasonable expectation of privacy in the Elk Ridge Road property is equivalent to that which is available under the traditional curtilage analysis that the court applies here.

As an initial matter, the court notes that there is a dispute as to where the three deputies who searched the Elk Ridge Road property were standing when they made their observations of Building 2 on the night of May 30, 2003. Sergeant Hanson's affidavit, which is consistent with the testimony given at the *Franks* hearing, places the deputies approximately 120 feet from Building 2 at their nearest point of approach. Opp'n, Exh. 1 at 5. Defendant claims that Hanson was actually standing much closer to Building 2, citing the following passage of Hanson's affidavit:

> As I was standing on the road looking at the structure[,] Deputy Peterson, who was standing approximately 20 yards behind me, yelled, "Car." Deputies Dean, Peterson, and I then stepped off the road to conceal ourselves .... The vehicle drove down the road to the structure and parked.

*Id.* Defendant argues that because Hanson claims to have seen a vehicle park in front of Building 1, his testimony regarding his proximity to the structure must have been false because Building 1 is not visible from the point in the road located 120 feet from Building 2. However, defendant's attempt to impeach Hanson's testimony ignores what his affidavit actually says. Contrary to defendant's assertion, Hanson's affidavit does not state that he saw a car park in front of Building 1; rather, it states that the car parked in front of "the structure," *id.*, which from the context of the affidavit appears to refer to the structure that he was observing—i.e., Building 2. Nor is it even clear that Hanson actually saw the car park. His affidavit states that "[t]he vehicle drove down the road to the structure and parked," *id.*, which is consistent with Hanson inferring that the car parked after he heard the engine shut off and a car door opening without necessarily seeing where the car parked. Furthermore, at the *Franks* hearing, both Hanson and Humboldt County Deputy Mark Peterson

confirmed the accuracy of the statement in Hanson's affidavit. Oct. 14, 2004 at 48, 102, 114. Accordingly, in the absence of any persuasive evidence to the contrary, the court finds Hanson's testimony to be credible and concludes that the deputies came no closer than 120 feet from Building 2—and thus no closer than 240 feet from the residence—on the night of May 30, 2003.

Standing in isolation, the fact that the deputies were approximately 240 feet from Building 1 does not rule out the possibility that the deputies intruded upon the curtilage. As the Second Circuit has observed, "[o]n a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door." *United States v. Reilly*, 76 F.3d 1271, 1277, *on reh'g*, 91 F.3d 331 (2d Cir.1996). Nonetheless, even in rural areas, it is rare for curtilage to extend more than 100 feet beyond the home. *See, e.g., Dunn*, 480 U.S. at 297, 302, 107 S.Ct. 1134 (holding that deputies who approached within 90 feet of a rural residence were not within the boundaries of the curtilage); *United States v. Van Damme*, 48 F.3d 461, 464 (9th Cir.1995) (200 feet is outside of the curtilage); *United States v. Brady*, 993 F.2d 177, 178 (9th Cir.1993) (45 feet is outside of the curtilage); *United States v. Traynor*, 990 F.2d 1153, 1158 (9th Cir. 1993) (70 to 75 feet is outside of the curtilage); *United States v. Calabrese*, 825 F.2d 1342, 1350 (9th Cir.1987) (50 feet is outside of the curtilage). *But cf. United States v. Furrow*, 229 F.3d 805, 817 (9th Cir.2000) (holding that the district court to not clearly err in finding that a distance of 100 feet is within the curtilage); *Depew*, 8 F.3d at 1427 (distance of 50 to 60 feet is within the curtilage). Thus, even though the deputies' proximity to the residence located on the property searched is not dispositive, the fact they were standing approximately

240 feet from that residence favors a finding that they were outside of the curtilage.

### B. *Enclosures*

The second *Dunn* factor requires the court to consider whether the area searched is included within any enclosure surrounding the home. 480 U.S. at 301, 107 S.Ct. 1134. As the Court observed in *Dunn*, the boundaries of the curtilage will typically be "clearly marked" and "easily understood from our daily experience." *Dunn*, 480 U.S. at 302, 107 S.Ct. 1134. The most commonly encountered lines of demarcation are gates and fences, which the Court characterized as "important factors in defining the curtilage." *Id.* at 301 n. 4, 107 S.Ct. 1134; *see also Johnson*, 256 F.3d at 902. Even in rural areas, where fences may be absent, "natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.'" *Johnson*, 256 F.3d at 902 (quoting *Dunn*, 480 U.S. at 302, 107 S.Ct. 1134).

Here, Buildings 1 and 2 are located in a natural clearing surrounded by dense vegetation. Under the rationale advanced in *Dunn* and applied by the Ninth Circuit in *Johnson*, the natural enclosure that surrounds these structures favors a finding that the area within the clearing is part of the curtilage and that those areas outside the clearing are not. As noted above, the point in the road at which the deputies stopped walking on the night of May 30, 2003 was not within the clearing. Thus, the court finds that this factor also weighs against defendant.[5]

### C. *Uses of Area Searched*

The third *Dunn* factor is the nature of the uses to which the area searched was put. 480 U.S. at 301, 107 S.Ct. 1134. In applying this factor to the instant motion, the court is mindful that the curtilage analysis is directed toward determining "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.; see also Depew*, 8 F.3d at 1427 n. 2. Here, the area searched was a dirt road. No part of the residence was visible from where the deputies were standing. Indeed, the only structure that the deputies were able to observe was Building 2, a garage-like building that was used for the purpose of growing marijuana. Accordingly, it would appear that the search at issue here does not implicate the interests served by extending Fourth Amendment protections to the curtilage

Although one might think that the inquiry into the nature of the uses of the premises searched would end there, the Ninth Circuit has held that the this factor implies that a government agent must possess "prior objective knowledge of the property's use" before approaching a structure "free of Fourth Amendment constraints." *Johnson*, 256 F.3d at 903 (citing *Depew*, 8 F.3d at 1426–27; *Calabrese*, 825 F.2d at 1350). In many cases, the extent of objective knowledge possessed by the officers performing the search is dispositive. For example, in *United States v. Shates*, 915 F.Supp. 1483 (N.D.Cal.1995) (Henderson,

---

**5.** Defendant makes much of the fact that a locked gate barred entry to the private road leading to Buildings 1 and 2. However, as noted above, this gate is located approximately three-fourths of a mile from the structures on the property. In contrast to an interior fence surrounding a home, a "perimeter fence"—or in this case, a gate—located near the boundary of a parcel will rarely be relevant in determining the extent of the curtilage. *See, e.g., Traynor*, 990 F.2d at 1158. This is particularly true where, as here, a significant distance separates the fence or gate from the home. Thus, the court finds that the gate located near Elk Ridge Road does not delineate the curtilage of the property searched.

C.J.), the court considered the constitutionality of a warrantless search of a large rural property in which the officers conducting the search had approached within 150 feet of the defendant's home. *Id.* at 1499–50, 1503. In upholding the validity of this search, the court relied heavily on the fact that the officers initiated the search only after they have received a tip from a "reliable" informant concerning illegal drug manufacturing activities that had taken place on the property. *Id.* at 1487–88, 1498. The officers also were able to smell methamphetamine as they approached the area where the search was carried out. *Id.* at 1498. The court found this objective information highly relevant in determining the extent of the curtilage, observing that the Fourth Amendment protections associated with a particular area "may stretch or contract based on the amount of objective information possessed by the law enforcement officers." *Id.* Thus, the court concluded that even though the search "may well have been within in the curtilage" in the absence of such objective information, the fact that the officers had "grounds to believe that they were not intruding on the curtilage of the property" required the court to deny the defendant's motion to suppress. *Id.* at 1498, 1503.

In reaching this conclusion, the *Shates* court distinguished the Ninth Circuit's decision in *Depew*. In that case, law enforcement officials had received a tip from an informant that a man named "Pepe" had aided the defendant in launching a marijuana growing operation. 8 F.3d at 1425. In reliance on this tip and without obtaining a warrant, a police officer conducted a search of the area around the defendant's home. *Id.* at 1426. In carrying out the search, the officer walked down the defendant's driveway and was able to smell marijuana from a point approximately fifty to sixty feet from the defendant's house (and within five to six feet of his garage). *Id.*

The officers subsequently obtained and executed a search warrant and confiscated more than 1,000 marijuana plants. *Id.* The defendant's motion to suppress evidence gathered pursuant to that warrant was denied by the district court. *Id.* The Ninth Circuit reversed, holding that the officer conducting the warrantless search of the defendant's property intruded upon the curtilage associated with his home. *Id.* at 1429.

As in *Shates*, this court finds that the facts of *Depew* are distinguishable from the case at bar. Unlike the search at issue here, the warrantless search in *Depew* was conducted prior to obtaining *any* information that tied the defendant's unlawful conduct to the property searched. *Id.* at 1429. In contrast, the search of the Elk Ridge Road property was prompted by an informant's detailed statement regarding an indoor marijuana growing operation located on the premises. While that statement may not have been sufficient to establish probable cause to search the premises in its entirety, it is material to determining whether the deputies entered the curtilage during the May 30, 2003 search. In light of this fact and in the absence of any suggestion that the area searched harbored any "intimate activities associated with domestic life and the privacies of the home," *Dunn*, 480 U.S. at 301 n. 4, 107 S.Ct. 1134, the court concludes that the nature of uses to which the area searched was put weighs against defendant.

## D. Steps Taken to Protect Area from Observation

The fourth and final *Dunn* factor requires the court to consider "the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134. While the language used by the *Dunn* Court appears to suggest that the individu-

al objecting to the search must take affirmative steps to shield his or her activities from public view, the Ninth Circuit has on occasion observed that the secluded nature of residential areas on large rural properties weighs in favor of finding that those areas are within the curtilage. *See Johnson*, 256 F.3d at 903; *Depew*, 8 F.3d at 1428. There is no dispute that the residence on the Elk Ridge Road property is in a remote area that is unlikely to be observed by casual passers-by. The locked gate blocking vehicular access to the driveway and the presence of "No Trespassing," "Private Road," and "Beware of the Dog" signs are additional evidence of defendant's understandable desire to exclude the public from the area searched. *Accord Depew*, 8 F.3d at 1428 (noting that "[t]he posting of 'No Trespassing' signs is significant in terms of constituting an effort to protect the inner areas of a parcel from observation") (citing *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134). Thus, the court finds that the fourth Dunn factor favors defendant.

### E. *Summary*

In summary, the court finds that the first three *Dunn* factors favor the government, while the fourth favors defendant. In assigning weight to these factors, the court is guided by the nature of the privacy interest advanced by extending Fourth Amendment protections to the curtilage. As the Supreme Court has repeatedly made clear, the Fourth Amendment borrows from the common law notion that the curtilage is an extension of the home. *See Oliver*, 466 U.S. at 180, 104 S.Ct. 1735. For that reason, a homeowner's reasonable expectation of privacy extends beyond the walls of the home to include the areas "associated with the sanctity of a [person's] home and the privacies of life." *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). However, an intent to maintain privacy does not necessarily establish a constitutionally protected private space. *Van Damme*, 48 F.3d at 464. Thus, an area that lacks any "indicia of activities commonly associated with domestic life" is not entitled to the full panoply of Fourth Amendment protections that have been afforded to such activities. *Id.*

In light of these considerations, the court finds that the area of the Elk Ridge Road property searched on the night of May 30, 2003 falls outside the curtilage of that property. At all times during the search, the deputies remained on or near the road leading to Buildings 1 and 2. The use of this road—i.e., transportation—can hardly be considered an "intimate activity." Moreover, the only structure that the deputies observed was used for the purpose of growing marijuana. Considering these facts, along with evidence of the substantial distance that the deputies maintained between themselves and the residence and the fact that search took place outside the natural "enclosure" surrounding the clearing, the court is compelled to conclude that the deputies did not enter the curtilage of the property.[6] The

---

**6.** To the extent that defendant argues that the court's finding with respect to the fourth *Dunn* factor warrants a contrary conclusion, the court finds the cases cited in his papers to be easily distinguishable from the case at bar. For example, in *Johnson*, a case that defendant cites with approval, the Ninth Circuit relied on the "rural and secluded" nature of the property searched as one of a number of reasons for reversing the district court's finding that the search at issue there took place outside of the curtilage. 256 F.3d at 903. However, the area searched in *Johnson* included a "relatively small yard ... enclosed by a five-foot high fence." *Id.* at 902. Thus, even if the Elk Ridge Road property is similarly rural and secluded, nothing in *Johnson* suggests that the curtilage surrounding Building 1 extends beyond the clearing in which that structure is located. Defendant also relies on *Depew*, another case in which the

court thus finds no basis for granting defendant's motion to suppress on that ground.

## II. *Night Vision Goggles*

■ Defendant next argues that even if the deputies were outside of the curtilage on the night of May 30, 2003, their use of night vision goggles to aid their observations of Building 2 violated the Fourth Amendment. As a general rule, the observation of a constitutionally protected area by a government agent standing in an open field or a public space does not constitute a "search" within the meaning of the Fourth Amendment. *Barajas–Avalos*, 377 F.3d at 1055–56 (citing *Dunn*, 480 U.S. at 298, 304, 107 S.Ct. 1134). However, an exception to this rule was recognized by the Supreme Court in *Kyllo*. In that case, the defendant moved to suppress evidence obtained pursuant to a warrant issued in reliance on the results of a thermal imaging scan of his home. *Kyllo*, 533 U.S. at 29–30, 121 S.Ct. 2038. The scan, conducted from a public right-of-way, revealed temperature gradients in the interior of the home that were consistent with (and were in fact caused by) high-intensity lights used in an indoor marijuana growing operation. *Id.* The Court held that the search violated the defendant's reasonable expectation of privacy, concluding that "[w]here, as here, the Government uses a device that is not in general public use[ ] to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40, 121 S.Ct. 2038.

There can be no serious dispute that there are significant technological differences between the thermal imaging device at issue in *Kyllo* and the night vision goggles used by the deputies during the search of the Elk Ridge Road property. While a thermal imaging scanner enables authorities to infer the presence of any relatively warm object (including a person) behind walls and other opaque barriers, *id.* at 35–36, 121 S.Ct. 2038, night vision goggles merely amplify ambient light to allow the wearer to see in relative darkness. The ability to " 'see' through walls" that so concerned the *Kyllo* Court simply does not arise when government agents conduct a search using night vision goggles. *Cf. id.* at 36 n. 3, 121 S.Ct. 2038. In light of such differences, several lower courts have held that *Kyllo* is inapplicable to searches that employ night vision equipment. *See, e.g., Baldi v. Amadon*, No. Civ. 02–313–M, 2004 WL 725618, at *3 (D.N.H. Apr.5, 2004); *People v. Katz*, No. 224477, 2001 WL 1012114, at *2 n. 4 (Mich.App. Sept.4, 2001) (per curiam), *appeal denied by* 465 Mich. 961, 640 N.W.2d 877 (2002).

For purposes of the instant motion, the court need not go so far as to hold that the rationale set forth by *Kyllo* could never apply to an open-field search conducted using night vision goggles. Rather, it is sufficient to note that the facts of this case are particularly unpromising terrain on

---

Ninth Circuit cited the "remote, secluded" location of the defendant's residence as evidence that the area searched was within the curtilage. 8 F.3d at 1428. However, as noted above, the officer who conducted the search at issue in *Depew* walked up a relatively short driveway and came within five to six feet of the defendant's garage. *Id.* at 1425–26. In contrast, the deputies who searched the Elk Ridge Road property did not come any closer than 240 feet from the residence and were more than 120 feet away from the nearest structure. As the court observed in *Depew*, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." *Id.* at 1426. As the facts of the aforementioned cases differ from those in the case bar, the court's disposition of the instant motion is also different.

which to test such a theory. The *Kyllo* Court made clear that its holding was premised on the heightened protection that the Fourth Amendment afforded to the intimate activities that occur within a home. *See, e.g.,* 533 U.S. at 37, 121 S.Ct. 2038 ("In the home, ... *all* details are intimate details, because the entire area is held safe from prying government eyes.") (emphasis in original); 533 U.S. at 40, 121 S.Ct. 2038 (observing that "the Fourth Amendment draws 'a firm line at the entrance to the house'" and that such a line "must not only be firm but also bright") (quoting *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). The search at issue here involved the use of night visions goggles to observe an outbuilding used for the purpose of growing marijuana. The structure was not anyone's home, nor was it intended or used for human habitation in any way. Thus, even assuming that *Kyllo* might impose some limit on the constitutionality of a government agent's use of night vision goggles to observe residential structures from open fields, the facts that would implicate such a limitation are simply not presented in the case at bar. The court therefore holds that the deputies' use of night vision goggles did not violate defendant's reasonable expectation of privacy in the Elk Ridge Road property.

## III. *Probable Cause for Issuance of the Warrant*

■ Having concluded that defendant's Fourth Amendment rights were not violated by the search of the Elk Ridge Road property conducted on the night of May 30, 2003, the court need only find that the evidence gathered in that search, along with the information provided to Hanson by the confidential informant, was sufficient to support a finding of probable cause for a search warrant to issue. "An affidavit in support of a search warrant demonstrates probable cause if, under the totality of the circumstances, it reveals a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Celestine,* 324 F.3d 1095, 1102 (9th Cir.2003) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "A court must uphold a warrant if, 'under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *United States v. Schmidt,* 947 F.2d 362, 371 (9th Cir.1991)).

Defendant does not dispute that Sergeant Hanson's affidavit is on its face sufficient to support a finding that probable cause to search the Elk Ridge Road property existed. Rather, defendant contends that the affidavit contains false and misleading statements that undermine the magistrate's finding of probable cause. As the Supreme Court held in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), suppression of evidence gathered pursuant to a search warrant is required if the magistrate issuing warrant was misled by statements in the affidavit that the affiant knew to be false or that the affiant made with reckless disregard of the truth. *Id.* at 914, 104 S.Ct. 3405 (citing *Franks,* 438 U.S. at 154, 98 S.Ct. 2674). Here, the court has already discussed—and rejected—defendant's attempt to cast doubt upon Hanson's testimony regarding the deputies' proximity to Building 2 on the night of May 30, 2003. Defendant also identifies a number of other purportedly willful representations or omissions in Hanson's affidavit, including: (1) representations as to when the confidential informant had been on the property; (2) Hanson's description of the light emanating from Building 2 as "extremely bright"; (3) Hanson's testimony as to when he and the other deputies left the Elk Ridge Road property; and (4) Hanson's failure to inform the magistrate that

the property was not connected to the electrical grid (and thus would need a generator to provide electric power for ordinary household uses). However, it is far from clear that any of these statements are materially false or misleading, and defendant's claim that they were made willfully or with reckless disregard as to their truth is nothing more than speculation. Indeed, Hanson's testimony in this court corroborates the essential details of his affidavit. Seeing no reason to doubt the credibility of this testimony, the court rejects defendant's contention that Hanson lied to the magistrate in order to obtain the warrant authorizing the search of the Elk Ridge Road property. The court thus holds that the warrant issued by the Humboldt County Superior Court on June 4, 2003 validly authorized the search of the property identified by APNs 220–301–020 and 221–240–020. Because defendant does not dispute that Buildings 1 and 2 are located on these parcels, the court denies defendant's motion to suppress the evidence gathered in the search of those structures.

### IV. *Search of Building 3*

■ Having concluded that the search of Buildings 1 and 2 was constitutionally permitted, the court turns to defendant's remaining argument, which pertains only to the search of Building 3. With respect to that structure, defendant argues that even if the warrant issued on June 4, 2003 is valid as to Buildings 1 and 2, evidence obtained in the search of Building 3 must nonetheless be suppressed because that

structure was not located on either of the parcels identified by the warrant. The government disputes this assertion and continues to maintain that Building 3 is in fact located on one of the two parcels identified in the June 4, 2003 warrant, parcel APN 220–301–020. However, the survey of the relevant property line conducted by Barry Kolstad leaves little doubt that Building 3 is located more than 100 feet north of APN 220–301–020 on the property of Yvonne Schad. Accordingly, the court agrees with defendant that the search of that structure was not authorized by the June 4, 2003 warrant.

Seizing on this fact, defendant argues that the search of Building 3 conducted by Humboldt County Deputies and federal agents on June 9, 2003 violated his Fourth Amendment rights. Once again, the court assumes without deciding that defendant had a reasonable expectation of privacy in the premises searched—in this case, the interior of Building 3.[7] Thus, the court must consider whether the "good faith exception" saves the evidence gathered in the search of Building 3 from suppression. Under this exception to the requirements of the Warrant Clause of the Fourth Amendment, evidence obtained in a warrantless search of a constitutionally protected area need not be suppressed if the government agent who conducted the search acted in good faith reliance on a facially valid warrant. *Leon*, 468 U.S. at 922, 104 S.Ct. 3405; *United States v. Huggins*, 299 F.3d 1039, 1044 (9th Cir.), *cert. denied*, 537 U.S. 1079, 123 S.Ct. 681, 154

---

**7.** Prior to 1998, the Schad property was under common ownership with the parcels identified in the warrant. Nov. 5, 2004 Tr. at 18–19 (Testimony of James Lamport). Through a series of transactions, the properties were quitclaimed to Yvonne Schad, the sister-in-law of John Mahoney. *Id.* at 18–19, 40–43. While Schad's relationship to the cooperative is unknown, the testimony at the *Franks* hearing permits an inference that defendant and other members of the cooperative had implicit permission to use her property. In any event, for reasons that will become apparent in the following discussion, the court need not determine the nature of defendant's privacy interest in the Schad property for purposes of adjudicating the instant motion.

L.Ed.2d 579 (2002). The exception applies unless (1) the searching officer's reliance on the warrant was not "objectively reasonable"; (2) the magistrate who issued the warrant "wholly abandoned his [or her] judicial role"; or (3) the officer who obtained the warrant acted in bad faith by misleading the magistrate. *Leon*, 468 U.S. at 922–23, 104 S.Ct. 3405; *Huggins* 299 F.3d at 1044.

The court has already concluded that the warrant authorizing the search of APNs 220–301–020 and 221–240–020 was facially valid and that Hanson did not intentionally or recklessly mislead the magistrate. Nonetheless, defendant argues that Hanson acted unreasonably and in bad faith when he authorized the search of Building 3 on June 9, 2003. As noted above, Hanson discovered Building 3 after the deputies had served the warrant and had begun to inventory the evidence recovered from Buildings 1 and 2. Oct. 14, 2004 Tr. at 64–65, 68 (Hanson Testimony). Upon making this discovery, he contacted BLM Special Agent Laurel Pistel and requested her assistance in determining whether the structure was located on one of the parcels identified by the warrant. *Id.* at 66. Using the reading from Hanson's handheld GPS unit to determine his location and the data from the Humboldt County Assessor's Office to determine the parcel boundaries, Pistel manually plotted this data on a USGS quadrangle map. *Id.* at 129–35 (Pistel Testimony). Her conclusion—that Building 3 was located on APN 220–301–020—turned out to be wrong. However, Hanson's effort to determine whether Building 3 was located on the premises to be searched was reasonable under the circumstances. While it certainly would have been more accurate to retain a surveyor to determine the precise location of the property boundary, the time and expense required to do so would go well beyond the bounds of ordinary prudence.

Nor is there any serious dispute that Hanson acted in good faith. Once again, defendant's assertion to the contrary—he appears to argue that Hanson intentionally excluded Building 3 from his report to the magistrate—relies entirely on speculation and is unsupported by any evidence in the record suggesting that Hanson intentionally misled the magistrate or this court. Accordingly, the court holds that the although the search of Building 3 fell outside the scope of the June 4, 2003 warrant authorizing the search of the Elk Ridge Road property, the good faith exception saves the evidence gathered in that search from the Fourth Amendment's exclusionary rule. The court therefore denies defendant's motion to suppress evidence obtained in the search of Building 3.

*CONCLUSION*

For the reasons stated above, defendant's motion to suppress is DENIED.[8]

IT IS SO ORDERED.

---

**8.** The court therefore denies the government's request to strike defendant's testimony as moot.